[No. S004692, Crim. No. 24634. Apr. 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
BRYAN JOSEPH MINCEY, Defendant and Appellant.

412

418

**COUNSEL**

Joan W. Howarth, under appointment by the Supreme Court, Paul L. Hoffman, Tracy Rice and Cathy Dreyfuss for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—A jury convicted defendant Bryan Joseph Mincey of first degree murder (Pen. Code, § 187; all statutory references are to the Penal Code unless otherwise indicated), three felony counts of endangering a child (§ 273a, subd. (1)), and two misdemeanor counts of endangering a child (§ 273a, subd. (2)).[1] The jury found to be true a special circumstance allegation that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).) Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We reverse the misdemeanor convictions for endangering a child (counts 5 and 6), but otherwise affirm the judgment, including the death penalty.

## I. GUILT PHASE FACTS

Defendant was Sandra B.'s boyfriend. Defendant and Sandra were jointly charged with the murder of Sandra's five-year-old son, James; the special circumstance allegation of torture murder, however, was against only defendant. Defendant and Sandra were also charged with five felony counts of endangering a child. Three of those counts related to the victim; the remaining two counts involved the victim's four-year-old sister, Wendy. The trial court granted Sandra's pretrial motion for severance, and the case proceeded to trial against only defendant.

### A. *Prosecution Evidence*

#### 1. *Prior Incidents*

On the morning of June 20, 1981, San Bernardino County Deputy Sheriff Dana Williams went to an apartment in Fontana, where defendant lived with Sandra B. and her two young children, James and Wendy. Defendant, who was holding a table leg, was arguing with Sandra in the front yard. James had a bloody nose and cuts around his mouth, and Wendy's two lower front teeth were missing. Defendant told the deputy that he and Sandra had been fighting because she did not want him disciplining the children. He denied having hit or kicked James, but admitted hitting Sandra after she hit him in the head with a brick. Defendant's head was red and swollen, and he had scratches on his chest. Defendant also admitted throwing a container of 500 capsules of "speed" into a nearby field. According to defendant, the capsules belonged to Sandra.

---

[1] At sentencing, the trial court reduced the felony convictions for endangering a child to misdemeanors.

Nearly two years later, on April 14, 1983, Deputy Williams again responded to a call about a fight between defendant and Sandra B. Defendant had a cut over his eye. James had bruises over his body, and large bumps and black and blue marks on his head. Sandra's upper lip and the inside of her mouth were cut, and the left side of her head was swollen. Defendant told Deputy Williams that he and Sandra had been fighting over the disciplining of James.

### 2. The Murder of James

#### a. Discovery of the killing

At 4 a.m. on December 23, 1983, the fire department responded to a call from Sandra B.'s neighbor. The neighbor had been awakened by Sandra, who was crying, screaming, and knocking on the neighbor's apartment door.

After entering Sandra B.'s apartment, Firefighter Gary Becks saw Sandra lying on a bed next to five-year-old James. The child was wet and wrapped in a blanket; he was dead.

Sergeant Patrick McCurry testified that after defendant had been placed in the back of a police car, defendant said: "I don't know what the big deal is. The kid croaked. That's all I know."

Defendant's blood test (taken at 6:15 that same morning) indicated .12 micrograms per milliliter of amphetamines.

#### b. Physical evidence

Both inside and outside the apartment, the police found a substantial amount of physical evidence relating to the murder of James. Outside the apartment was a board with blood and fecal material. The blood was consistent with James's blood. In the living room was a leather belt with metal grommets and feces. There was also feces on a plastic cup near the television. Two small pillows in a trash can in the kitchen had bloodstains that were consistent with the blood types of the victim and his mother, Sandra B. In the bedroom were a pile of wet, bloodstained children's clothes and a fan belt with human blood on it.

Additional items of evidence found in the bedroom consisted of clumps of brown hair, consistent with the hair of the two children; a fan belt; adult-size jeans with a light bloodstain; a leather cartridge belt; and an adult-size plaid shirt with a bloodstain consistent with defendant's blood type. Throughout the bedroom were blood smears and water-diluted blood; curtains in the linen closet had blood that was consistent with James's blood type.

c. *Medical evidence*

Dr. Irving Root performed the autopsy on James's body. He concluded that massive blunt-force injuries were the cause of death. The shock of repetitive injuries and the tearing of tissues led to chemical imbalances that resulted in the stoppage of the intestinal tract and swelling of the brain. James's body had hundreds of injuries, virtually all of which could have been inflicted within 24 to 48 hours of death.

There were numerous abrasions and bruises on James's face and head. His back had a number of abrasions, including four straight lines on the left side of his neck and shoulders. The backs of his hands were bruised, and there was a band of bruises across his waist. James's hips, thighs, knees, legs, and feet also had a number of bruises and cuts.

The penis and the right side of the scrotum were bruised. The mucous membrane of the anus was torn, and there was a tear inside the rectum two to three inches from the opening of the anus. Inside the buttocks, a pocket of tissue was torn where it had been sheared across itself. Dr. Root testified: "Injuries of that sort [shearing and tearing injuries producing a pocket of tissue under the skin] are the kinds of things I see in the automobile accidents. Shearing of tissue against tissue, of tearing. It takes a substantial amount of force to cause that kind of injury."

In Dr. Root's opinion, many of the bruises could have been caused by a hand hitting James. The shearing of the buttocks, however, could not have been done by hand. Of the physical objects recovered from the scene and shown to Dr. Root at trial, the board was the only object that could have caused the injury to James's buttocks. The tear in the outside of the anus and in the tissue of the buttocks could have been caused by the edge of the board being forced between the thighs and then pushed towards the anus. The amount of force required would have to have been substantial. The edge of the board could also have caused a number of the straight-line injuries on James's back. Repeated blows with the cartridge belt could have caused the bruising over the buttocks and thighs. The tear inside the rectum was consistent with an injury caused by a fingernail.

Dr. Root stated that James experienced prolonged pain before his death. The amount of time between the onset of the injuries and the loss of sensation or the ability to feel pain as a result of the physiological effects of the injuries was more than a few minutes, perhaps an hour or more. Although he could not be more specific, Dr. Root explained that the metabolic changes caused by the injuries and the onset of death would have taken hours to

develop, and that James's loss of sensation of pain would have occurred 15, 30, or possibly 60 minutes before death.

James's four-year-old sister, Wendy, was examined by Dr. Max Lebow on December 23, 1983, the date of James's murder. She showed these injuries: neck, face, and head bruises that were incurred in a period spanning two to three days to twelve hours before the examination. There were also bruises on her groin, thighs, and feet. The bruises on the thighs were less than 24 hours old. Injuries on Wendy's back were consistent with her having been hit with a belt with "eyelets," and the injuries to her left thigh could have been caused by a belt. Bruises on her waist could have been caused by a belt being pulled tightly around her waist; and injuries to her thigh, back of the legs, and buttocks could have been caused by a board. In Dr. Lebow's opinion, Wendy's injuries were too extensive to have been accidental. That was also the view of Dr. Herbert Geise, who examined Wendy five days after James's death.

### d. *Testimony of Wendy*

Wendy, James's sister, was five years old when she testified at defendant's trial. She said that on one occasion defendant had kicked one of her teeth out, that she and James had been whipped with a belt the night James died because she had wet the bed, and that defendant did most of the whipping. Defendant had always been mean to her.

### e. *Interviews of defendant*

The police interviewed defendant three times after the killing of James. Each of the interviews was tape-recorded and played for the jury. On each occasion, defendant was advised of, and waived, his constitutional rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

### (1) *First interview*

On December 23, 1983, at 12:20 p.m., approximately eight hours after the murder of James was discovered, Sergeant Baker and Detective Larry Brown talked to defendant. Defendant made these statements:

Defendant admitted having spanked James and Wendy during the day of the murder, but denied having whipped them that night. He had not used alcohol or drugs that night. Around 10:30 p.m., Sandra B. asked defendant to go to the store and buy some diapers. When defendant returned 15 minutes

later, the children and Sandra were in the bedroom. Defendant initially stated that he was in the front room playing with the children's Christmas toys when James started to choke and Sandra called him into the bedroom. He later stated, however, that he went into the bedroom to get his battery charger and at that time held James's legs down on the bed while Sandra whipped James with a belt. During the whipping, James defecated and defendant sent him to the bathroom to complete his bowel movement. Thereafter, Sandra again whipped James, who again defecated in his pants. When Sandra pulled James's pants down, the feces fell on the floor. Defendant made James pick up and taste the feces. Defendant left the bedroom. Sandra then called him, saying that James was choking. After attempting mouth-to-mouth resuscitation, Sandra and defendant put James in the shower and rolled him in a blanket. Defendant denied doing the beating that killed James; he also denied knowing anything about Wendy's injuries, blood on the walls, or the blood- and feces-covered board the police had found.

### (2) Second interview

Five hours after the first interview, Officer Powell and Detective Larry Brown again talked to defendant. Defendant admitted that he had lied in the prior interview about not having hit James the day of the murder. He also admitted hitting Wendy that night. Defendant insisted that Sandra B. had done the beatings, and again denied any knowledge of the board.

### (3) Third interview

On December 26, 1983, Officer Powell and Detective Larry Brown had a third interview with defendant. Defendant accused Sandra B. of administering the fatal beatings. He continued to deny any knowledge of the board.

According to defendant, Wendy and James had been sodomized by their 15-year-old cousin, and would use their own feces as a sexual lubricant. On the night of James's murder, defendant made James taste his own feces; this was to toilet train him. Defendant admitted having whipped James and Wendy three times on the morning preceding the murder, for wetting the bed.

## B. Defense Evidence

Three of defendant's friends (Nicole Slapper, Michael David Brown, and Carla Brown) testified that they saw defendant use amphetamines, which caused defendant to be very angry and "wired."

The defense also presented psychological and psychiatric testimony. Dr. Craig Rath, a licensed clinical psychologist, testified that defendant had told him the following:

Defendant had used amphetamines the day before James's death. Defendant accused Sandra B. of doing most of the beatings. On the morning of James's death, defendant spanked the children after catching them in sexual activities. At Sandra's request, defendant went to the store to buy diapers. When he returned, James was rolled in a blanket. Defendant wanted to take James to the hospital but Sandra refused for fear of losing her welfare check. She threatened to blame defendant for James's injuries if he took James to the hospital. She and defendant then put James, who could not stand up, in the shower to revive him. That was the first time defendant saw the injuries to James's buttocks. When he asked, "how did his ass get that way," Sandra replied, "I beat him while you were gone." After placing amphetamines on James's tongue, Sandra went out and called for medical help.

Dr. Rath concluded that defendant had an IQ of 78, was functioning at the level of a 14-year-old, and was immature neurologically. In Dr. Rath's opinion, defendant was not psychotic, he had no significant organic damage, and he did not have a major mental illness. He diagnosed defendant as having a mixed personality disorder, which he described as an "intermittent explosive disorder." The disorder would cause accumulated psychological pressures to come to an "explosion," leading to loss of control. According to Dr. Rath, defendant's acts reflected a desire to punish rather than an intent to kill, and defendant probably did not know that his acts were killing James.

Dr. Lorna Forbes, a psychiatrist, testified to what defendant's mother had told her about defendant's childhood. Defendant's father was a brutal man who beat his children with a belt and a board, and sexually molested them. Like Dr. Rath, Dr. Forbes diagnosed defendant as having an intermittent explosive disorder. In the opinion of Dr. Forbes, defendant did not intend to torture James and did not intend to kill, but did intend to participate in punishing him. Defendant was not psychotic and was not suffering from amphetamine psychosis.

Dr. Anthony Oliver, a psychiatrist and neurologist, testified that he found no evidence of any disorder. He criticized the reports and conclusions of Drs. Rath and Forbes as inadequate. He found no evidence of organic brain damage or amphetamine psychosis. In his opinion, defendant would have been fully aware of the harm he was inflicting on James and intended to inflict the harm.

Dr. Julian Beaber, a child abuse expert, distinguished torture from punishment and child abuse on the basis that the abuser has the long-term goal of controlling behavior, while the ultimate purpose of the torturer is the infliction of pain for its own sake.

## II. GUILT PHASE ISSUES

A. *Insufficiency of Evidence*

Defendant contends his conviction must be reduced to second degree murder because the evidence was insufficient to establish first degree murder by torture. ■ The essential elements of first degree torture murder are: (1) the acts causing the death must involve a high degree of probability of death, and (2) the defendant must commit the acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal. Rptr. 794, 710 P.2d 861].) Intent to kill is not an element of the offense. (*Ibid.*)

■ Defendant argues that here the only evidence of intent to torture was the condition of the victim's body, and that as a matter of law intent to torture cannot be inferred solely from the condition of the victim's body. He is wrong.

■ In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. ■■■ The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)[2]

As defendant points out, the severity of a victim's wounds is not necessarily determinative of intent to torture. Severe wounds may be inflicted as a result of an explosion of violence (*People* v. *Steger* (1976) 16 Cal.3d 539, 547, fn. 3 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]) or an "act of animal fury" (*People* v. *Tubby* (1949) 34 Cal.2d 72, 78 [207 P.2d 51]).

---

[2]It is unclear from defendant's brief whether his challenge to the sufficiency of the evidence is made in connection with the trial court's denial of the defense motion for judgment of acquittal (§ 1118.1), or in connection with the guilt phase in its entirety. The standard applied by the trial court under section 1118.1 in ruling on a motion for judgment of acquittal is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) The discussion that follows analyzes the sufficiency of the evidence first in the context of whether the evidence presented in the prosecution's case-in-chief was sufficient to establish every element of the offense, and then in the context of whether the evidence is sufficient to support the conviction.

It does not follow, however, that because the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, the nature of the victim's wounds cannot as a matter of law be probative of intent. Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense. (*People* v. *Davenport, supra,* 41 Cal.3d at p. 270.) The condition of the victim's body may establish circumstantial evidence of the requisite intent. "In determining whether a murder was committed with that intent [to torture], the jury may of course consider all the circumstances surrounding the killing. Among those circumstances, in many cases, is the severity of the victim's wounds." (*People* v. *Steger, supra,* 16 Cal.3d at p. 546; *People* v. *Davenport, supra,* 41 Cal.3d at p. 268.)

Defendant's reliance on *People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [554 P.2d 881], is misplaced. In that case, this court stated: "[The defendant] correctly notes that murder by torture cannot be inferred solely from the condition of the victim's body [citation], or from the mode of assault or injury suffered [citation], but other evidence of intent to cause suffering is also required. [Citations]." (*Ibid.*) This statement, however, must be read in the context of the case in which it was made.

The evidence in *Wiley* established that the victim died as a result of trauma caused by a blunt instrument. The body had 30 fresh wounds that were inflicted by a baseball bat, the claw of a hammer, and the rounded head of the hammer. (18 Cal.3d at p. 166.) The wounds were inflicted in rapid succession. (*Id.* at p. 167.) In affirming the torture-murder conviction, this court reasoned that the defendant's statements that she wanted to hit the victim on the hand and that she wanted her money back from the victim, "when considered with the manner in which the beating to [the victim] was administered," permitted an inference of intent to cause pain. (*Id.* at p. 168.)

Thus, when considered in context, the language from *Wiley, supra,* 18 Cal.3d at page 168, relied on by defendant does not preclude as a matter of law an inference of intent to torture based on the condition of the victim's body. We have recognized, both before and after *Wiley,* that such an inference may be based on the condition of the body. (See e.g., *People* v. *Davenport, supra,* 41 Cal.3d at p. 268; *People* v. *Steger, supra,* 16 Cal.3d at 546; *People* v. *Washington* (1969) 71 Cal.2d 1061, 1083 [80 Cal.Rptr. 567, 458 P.2d 479], quoting *People* v. *Butler* (1962) 205 Cal.App.2d 437, 441 [23 Cal.Rptr. 118].)

Here, the evidence shows that defendant beat James repeatedly over an appreciable period of time. The nature of the wounds, which themselves

indicate that they were inflicted over a period of time, supports the inference that defendant intended to inflict cruel pain and suffering.

■ Next, quoting language from *People* v. *Steger, supra,* 16 Cal.3d 539, 548, defendant argues that his actions constituted a "misguided, irrational and totally unjustified attempt at discipline" rather than wilful, deliberate, or premeditated acts. Defendant appears to assume, erroneously so, that an intent to torture may not be legally found if a "misguided attempt at discipline" played any part in the process that ultimately led to the victim's death.

In *People* v. *Steger, supra,* 16 Cal.3d 539, which involved the fatal beating of a child, we held that the evidence established that "[t]he beatings were a misguided, irrational and totally unjustified attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." (*Id.* at p. 548.) *Steger* did not, however, hold or suggest that a child abuse homicide could not also constitute a torture murder. We specifically said in *Steger*: "In holding the evidence does not support a conviction of first degree murder, we do not imply, of course, that a murder of a child can never be torture murder. In appropriate circumstances a child batterer can be found to be a torturer. All we hold is that here the prosecution did not prove defendant murdered her stepchild with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*Id.* at p. 549.)

The death of a child may result from an explosion of violence, a misguided attempt at discipline, or torture, depending on the facts of the case. (*People* v. *James* (1987) 196 Cal.App.3d 272, 293 [241 Cal.Rptr. 691].) Just as child abuse can involve torture, a misguided attempt at discipline can involve an intent to cause cruel pain and suffering. There is no legal immunity from conviction for first degree torture murder because the victim happened to be a child.

Defendant argues that his first degree murder conviction must be set aside because the evidence was insufficient to support the jury's finding that he had acted with a premeditated and deliberate intent to inflict extreme and prolonged pain. In support, he cites *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942].

In *Anderson* we said that generally first degree murder convictions are affirmed when (1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill.

(70 Cal.2d at pp. 26-27.) Defendant contends here there is no evidence of planning, motive, or an exacting manner of killing. Because the requisite element of first degree torture murder is the deliberate and premeditated intent to inflict torture (*People* v. *Steger, supra,* 16 Cal.3d at p. 546), rather than intent to kill (*People* v. *Davenport, supra,* 41 Cal.3d at p. 267), the issue is whether there is sufficient evidence of planning, motive, or method to inflict torture.

With these considerations in mind, we now evaluate defendant's conviction for murder by torture in light of the evidence in this case, first in the context of the trial court's denial of defendant's motion for judgment of acquittal at the end of the prosecution's case-in-chief and then in the context of the jury's decision at the guilt phase as a whole. (See fn. 3, *post.*)

The prosecution presented evidence that the police had on two prior occasions responded to calls involving physical injuries to James. In this case, the physical evidence relating to the killing of five-year-old James included blood throughout the bedroom, belts and a board with blood and feces, and a large clump of brown hair consistent with James's hair. Dr. Irving Root, the physician who performed the autopsy, testified that James had incurred hundreds of injuries within 24 to 48 hours of death; that he had been beaten with hands, belts, and a board; that the beating lasted hours; that James might have lost the ability to feel any sensation of pain for as much as an hour before his death; that the shearing of the tissues in James's buttocks was caused by a substantial force being applied with a straight edge; that the tear two to three inches inside James's rectum was not caused by the application of force outside the rectum but was consistent with a tear caused by a fingernail; and that there were puncture marks behind both of James's knees.

We conclude that the trial court properly denied the motion for judgment of acquittal. The evidence presented by the prosecution was sufficient to establish every element of the offense of murder by torture. The length of time over which the beatings occurred, the number of injuries inflicted, the variety of objects with which the injuries were inflicted, and the fact that the victim was made to eat his own feces established planning and a preconceived design to inflict cruel pain and suffering.

The evidence was also sufficient to support the jury's finding that defendant was guilty of murder by torture. In addition to the evidence that we discussed above, Dr. David Oliver testified that in his opinion defendant was aware of the harm he was inflicting on James and intended to inflict the harm. Although there was testimony by Dr. Craig Rath that defendant

suffered from an intermittent explosive disorder, he also expressed the opinion that the disorder's episodes of loss of control of aggressive impulses might be of brief duration, sometimes just seconds, often only a couple of minutes, and that, based on his review of police reports and interviews of defendant, defendant "lies all the time." As to the latter aspect, we note that defendant's version of the pertinent events leading to James's killing varied in the interviews he had with the police. ■■■ ■■ From the circumstances surrounding James's death—including the number and nature of the wounds, and the length of time over which they were inflicted—and the expert testimony presented, the jury could have reasonably found beyond a reasonable doubt that defendant's acts were premeditated and deliberate, involved a high probability of death, and were committed with the intent to cause cruel pain and suffering for a sadistic purpose.[3] (See *People* v. *Demond* (1976) 59 Cal.App.3d 574, 585 [130 Cal.Rptr. 590].)

## B. *Instructional Error*

### 1. *Refusal of Defense Instructions*

The trial court gave the jury the standard instruction defining torture murder. (CALJIC No. 8.24 (4th ed. 1979).)[4] The court also gave this instruction: "First degree murder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain. In determining whether a murder was committed with that intent, the jury may consider all the circumstances surrounding the killing. Among those circumstances is the severity of the victim's

---

[3]Defendant also argues that the Eighth Amendment's prohibition against cruel and unusual punishment and principles of due process under the Fourteenth Amendment require that a distinction be made between parents who abuse their children in an attempt to discipline them and those who torture murder, and that an inference of intent to torture cannot be based solely on the condition of the victim's body. Defendant asserts that a parent's authority to discipline a child, an authority that does not exist in other relationships, compels acceptance of his argument. The argument is devoid of merit.

As we have seen, a distinction between misguided child discipline and torture murder is legally recognized. The federal Constitution does not require the conclusion that the authority of an individual to discipline a child extends to acts involving a high probability of death committed with the intent to cause cruel pain and suffering. Imposition of the death penalty on a parent, or other person, who kills a child in such a situation is not disproportionate to the individual's culpability. (See *People* v. *Wade* (1988) 44 Cal.3d 975, 1000 [244 Cal.Rptr. 905, 750 P.2d 794].)

[4]CALJIC No. 8.24 provided: "Murder which is perpetrated by torture is murder of the first degree. [¶] The essential elements of such a murder are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose. [¶] The crime of murder by torture does not necessarily require proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain."

wounds but such evidence must not be considered to the exclusion of other evidence bearing on intent."

■ Defendant faults the trial court for refusing to give two instructions patterned after a statement by this court in *People* v. *Steger, supra,* 16 Cal.3d at page 548, that "the beatings were a misguided, irrational and totally unjustifiable attempt at discipline."[5] We disagree.

A trial court must instruct on the *law* applicable to the facts of the case. (§§ 1093, subd. (f), 1127.) In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049].) The court must, however, refuse an argumentative instruction, that is, an instruction "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1276 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Farmer* (1989) 47 Cal.3d 888, 913-914 [254 Cal.Rptr. 508, 765 P.2d 940].)

In asking the trial court to emphasize to the jury the possibility that the beatings were a "misguided, irrational and totally unjustifiable attempt at discipline rather than torture," defendant sought to have the court invite the jury to infer the existence of his version of the facts, rather than his theory of defense. Because of the argumentative nature of the proposed instructions, the trial court properly refused to give them. With respect to the remaining portions of the two requested instructions, they were repetitive of instructions already given and therefore were properly refused. (*People* v. *Farmer, supra,* 47 Cal.3d at p. 913.)

Also without merit is defendant's argument that the trial court's failure to give the requested instructions violated a "panoply of Federal and State Constitutional Rights." Specifically, defendant asserts that his right to have

[5]The first instruction requested stated: "If you find that the beatings were a misguided, irrational and totally unjustified attempt at discipline rather than torture as defined above, you may conclude that they were not in a criminal sense wilful, deliberate, or premeditated." (See *People* v. *Steger, supra,* 16 Cal.3d at p. 548.)

The second proposed instruction read: "Murder by means of torture under section 189 is murder committed with the wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain. In determining whether a murder was committed with that intent, the jury may of course consider all the circumstances surrounding the killing. Among those circumstances, in many cases, is the severity of the victim's wounds. You are admonished against giving undue weight to such evidence, however, as the wounds could in fact have been inflicted in the course of a killing in the heat of passion (or a misguided, irrational and totally unjustifiable attempt at discipline) rather than a calculated torture murder." (See *People* v. *Steger, supra,* 16 Cal.3d at p. 546.)

the jury determine every material issue presented by the evidence was violated, that a critical factual issue was removed from the jury's consideration, and that his right to present a defense was impaired. Defendant's assertion that his acts constituted a "misguided attempt at discipline" is a factually based argument directed at an attempt to negate the element of intent. It is not a legal defense. Defendant fails to recognize this basic distinction.

## 2. Trial Court's Refusal to Give Instructions on Manslaughter

The trial court instructed the jury on first and second degree murder. It refused to give defendant's proposed instructions on voluntary and involuntary manslaughter, on the ground there was no factual basis to justify such instructions. Defendant complains that the court's refusal was erroneous for two reasons.

First, defendant argues that the jury could have found him guilty of involuntary misdemeanor manslaughter, based on misdemeanor child endangerment, if it concluded that he had failed to intercede in Sandra B.'s beating of James or that he had failed to exercise due caution in disciplining James. Second, defendant asserts that the jury could have found him guilty of involuntary manslaughter because the defense testimony regarding defendant's taking of amphetamines at the time of the offense, his low IQ, and his "explosive personality disorder" provided a basis for the jury to determine that he did not possess the mental state required for murder.

Defendant's arguments assume either that he was not the actual killer of James or that he did not have the intent to kill. Because a trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual question adversely to the defendant under other instructions (*People* v. *Turner* (1990) 50 Cal.3d 668, 690-691 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]), we need not decide whether in this case the evidence required the giving of instructions on manslaughter. Here, the trial court instructed the jury that, before it could find the special circumstance of torture murder to be true, it had to decide that defendant was the actual killer (see *People* v. *Ross* (1979) 92 Cal.App.3d 391, 403 [154 Cal.Rptr. 783]; but see § 190.2, subd. (c)) and that he had the intent to kill (§ 190.2, subd. (a)(18); *People* v. *Davenport, supra*, 41 Cal.3d at p. 271). When the jury

found this special circumstance allegation to be true, it necessarily resolved against defendant the factual questions on manslaughter.[6]

## C. *Exclusion of Evidence Relating to Sandra B.*

### 1. *Evidence of Drug Use and Prior Child Abuse*

The defense offered to introduce evidence that Sandra B. had used drugs and abused her children before the beatings that resulted in James's death. After the prosecution stated that if such evidence was admitted the prosecution would also introduce evidence of similar acts by defendant, the trial court granted the prosecution's motion *in limine* to exclude the evidence because "Sandra's abuse of the children has been conceded and testified to and is not in issue," because introduction of the evidence would require evidence of defendant's prior abuse to be introduced so that the complete "story" would be before the jury, and because evidence that Sandra or defendant "did certain things in the past" did not establish that Sandra or defendant "did these things in the present." Thus, the court ruled that evidence of Sandra's drug use and child abuse at times unrelated to the date of James's death was improper character evidence (Evid. Code, § 1101), and was irrelevant, cumulative, and would unduly consume time (*id.*, § 352).

■ Defendant contends the trial court abused its discretion in granting the prosecution's motion *in limine*. He asserts that the court's ruling violated his rights to compulsory process, confrontation, and due process under both the United States and California Constitutions. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15.) He also argues that he was deprived of a fair trial because the prosecution exploited the excluded evidence by comparing defendant's culpability to Sandra B.'s culpability while preventing the jury from learning of evidence damaging to Sandra.

We cannot conclude that the trial court abused its discretion in excluding the evidence under Evidence Code section 352. A trial court may exclude evidence under Evidence Code section 352 if its probative value is substantially outweighed by the probability that admission will unduly consume time, create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. (Evid. Code, § 352.) Cumulative evidence may be excluded on this basis. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 525 [224 Cal.Rptr. 112, 714 P.2d 1251].) The court's exercise of discretion will not be reversed on appeal absent a clear showing of abuse. (*Id.* at p. 526.)

---

[6]Defendant also complains that the instruction on murder perpetrated by torture, CALJIC No. 8.24 (4th ed.), did not specifically refer to acts being committed with a "conscious disregard for human life." Any deficiency was cured by the court's other instructions on malice aforethought. (See *People* v. *Garrison* (1989) 47 Cal.3d 746, 780 [254 Cal.Rptr. 257, 765 P.2d 419].)

Here, the discussion of the evidence was limited to general references to Sandra B.'s prior abuse of the children, and was in a context in which it was clear that its admission would result in the admission of similar prior acts of defendant by the prosecution. In this situation, we cannot conclude the trial court abused its discretion in ruling that the admission of the evidence would require an undue consumption of time or create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. (Evid. Code, § 352.)

Nor did the trial court abuse its discretion in concluding that the evidence would be cumulative. The evidence before the jury disclosed that Sandra B. too had abused the children. For instance, four-year-old Wendy testified that defendant did *most* of the "whipping" the night James died; the jury heard the tape-recorded police interview of defendant in which defendant accused Sandra B. of administering beatings; a police officer testified that, in an incident that occurred two years before the murder in this case, defendant claimed that Sandra had abused the children; and there was testimony by Dr. Rath, a clinical psychologist, that he formed the initial impression, based on his review of the reports and records before talking to defendant, that "a good deal of physical abuse of the children had taken place probably by both parties with an unknown extent by one party or the other."

Because the trial court's ruling was not an abuse of discretion under Evidence Code section 352, we need not address the question whether the court improperly excluded character evidence under Evidence Code section 1101.

Also without merit is defendant's argument that the excluded evidence deprived him of his constitutional right to present a defense. Application of the ordinary rules of evidence, as the trial court did here, does not impermissibly infringe on a defendant's right to present a defense. (*People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].)

2. *Sandra B.'s Invocation of the Fifth Amendment Privilege Against Self-incrimination*

Defendant subpoenaed Sandra B. to testify at the guilt phase of his trial. Like defendant, Sandra was charged with the murder of James. At a court hearing outside the jury's presence (see Evid. Code, § 402) the defense questioned Sandra, who refused to respond, asserting her privilege against self-incrimination under the Fifth Amendment of the federal Constitution. Sandra informed the court that, on the advice of counsel, she would invoke the privilege in response to any question asked by defendant.

The trial court denied defendant's request to compel Sandra B. to invoke the privilege against self-incrimination in front of the jury.

██ Defendant contends that the court's ruling violated his constitutional rights to due process and to present a defense. He argues that Sandra's interests could not have been infringed by telling the jury of Sandra's invocation of her Fifth Amendment rights. He is wrong.

Evidence Code section 913, subdivision (a) prohibits the trial court and counsel from commenting on a witness's assertion of a privilege. It further provides that "the trier of fact may not draw any inference [from the assertion of a privilege] as to the credibility of the witness or as to any matter at issue in the proceeding." And Evidence Code section 913, subdivision (b) requires the court, at the request of an adversely affected party, to instruct the jury that it may not draw any inferences from the exercise of a privilege as to the credibility of a witness or as to any matter at issue in the proceeding. The statutory prohibition applies to witnesses as well as parties litigant. Defendant's request that the trial court compel Sandra B. to invoke the privilege in the presence of the jury was in direct violation of Evidence Code section 913. The court's refusal to do so was therefore proper.

Defendant argues that Evidence Code section 913 infringes upon his constitutional rights to due process and to present a defense. Defendant's argument is based on his assumption that Sandra B.'s invocation of the privilege against self-incrimination would allow the jury to draw the inference that it was Sandra, not defendant, who had killed James. But, as explained below, it would have been improper for the jury to draw such an inference.

A person may invoke the constitutional privilege against self-incrimination for a reason other than guilt. The privilege may be asserted, for example, simply to insure that the prosecution against a person charged with a crime is not helped by that person's own statements. Thus, inferring guilt from the mere exercise of the privilege would be improper and is at best based on speculation, not evidence. (See e.g., *People* v. *Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Johnson* (1974) 39 Cal.App.3d 749, 760 [114 Cal.Rptr. 545], quoting *Bowles* v. *United States* (D.C. Cir. 1970) 439 F.2d 536, 541-542 [142 App.D.C. 26]; see Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 913, p. 496 [Deering's Ann. Evid. Code (1986 ed.) § 913, p. 80].) To avoid the potentially prejudicial impact of having a witness assert the privilege against self-incrimination before the jury, we have in the past recommended that, in determining the propriety of the witness's invocation of the privilege, the trial court hold a pretestimonial hearing outside the jury's presence. (*People* v. *Ford* (1988) 45 Cal.3d 431, 441, fn. 6 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785].) This was done here.

A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference. (See *People* v. *Frierson, supra,* 53 Cal.3d at p. 743.) If the trial court in this case had permitted defendant to compel Sandra B. to assert the privilege in front of the jury, it would have been required, on request, to instruct the jury not to draw the very inference defendant sought to present to the jury. (Evid. Code, § 913, subd. (b).)

Defendant's reliance on *United States* v. *Robinson* (1988) 485 U.S. 25 [99 L.Ed.2d 23, 108 S.Ct. 864] is misplaced. There, the high court held that it was permissible for the prosecutor to respond to the defendant's assertion that the government had not allowed him to give his version of events, by pointing out that the defendant had the opportunity to testify and did not do so. (*Id.* at pp. 26, 34.) Here, it was defendant, not the prosecutor, who attempted to "comment" on a witness's assertion of a constitutional right, by seeking to have the jury draw an inference of guilt from Sandra B.'s invocation of the privilege against self-incrimination.[7]

We conclude that the trial court did not err in refusing defendant's request to compel Sandra B. to invoke before the jury her privilege against self-incrimination.

3. *Trial Court's Refusal to Have the Jury See Sandra B.*

During the prosecution's case-in-chief, the trial court allowed the defense to call Sandra B. as a witness out of order. After Sandra's assertion of the Fifth Amendment privilege against self-incrimination outside the jury's presence, the defense requested that the court permit the jury to see Sandra. The prosecution objected on the ground of lack of relevancy. The defense countered that it was relevant to the issue of whether in their relationship defendant or Sandra was the dominant personality and thus "in control of any particular incidents." The trial court denied defendant's request without

---

[7]Defendant repeatedly characterizes Sandra B.'s assertion of the privilege against self-incrimination as a refusal to testify "when called by the defense." Defendant also accuses the prosecution of manipulating Sandra's invocation of the privilege in "a deliberate attempt to make capital for the prosecution from the witness' privilege." It is true that Sandra refused to testify for the defense because it was the defense, not the prosecution, that called her as a witness. Defendant's attempt, however, to insinuate prosecutorial misconduct from Sandra's assertion of the privilege finds no support in the record. The fact that Sandra's trial was severed from defendant's and the fact that she was subsequently tried based on the transcripts of the proceedings in this case do not by themselves establish manipulation by the prosecution. Sandra was independently represented by counsel. Her attorney's decisions regarding the best means to defend her, including the advice to invoke the privilege against self-incrimination, may not have been consistent with defendant's interest, but they do not establish prosecutorial manipulation or any other impropriety.

prejudice to it being renewed during the defense case upon a showing of justification. Defendant did not renew the request.

■ The trial court did not abuse its discretion in provisionally denying defendant's request that the jury view Sandra B. (See *People* v. *Gordon, supra,* 50 Cal.3d at p. 1239.) The request was made during the prosecution's case-in-chief and before the defense introduced expert testimony that Sandra rather than defendant was the dominant personality in their relationship. The trial court expressly denied the request without prejudice to its being later renewed, thus allowing the defense to again raise the issue at a later time.

Even if it were erroneous, the trial court's ruling did not prejudice defendant. The relative physical strength of defendant and Sandra B. was not a critical issue. At the time of his death, James was 45 inches tall and weighed 45 pounds. There is no question that either defendant or Sandra possessed physical strength sufficient to have killed the child. To the extent a jury view of Sandra was relevant at all, it related to defendant's assertion that Sandra was the dominant personality in their relationship. No evidence was presented at trial that the relative physical size or strength of persons is determinative of "control." In addition, in the opinion of Dr. Craig Rath, a clinical licensed psychologist called as a witness by the defendant, Sandra rather than defendant was the dominant personality in the relationship. Under these circumstances, the probative value of having Sandra appear before the jury was minimal.

D. *Challenges to Wendy's Testimony*

Wendy, Sandra B.'s daughter and James's sister, who was five years old at the time of trial, was called as a witness by the prosecution. Defendant contends that Wendy was incompetent to testify as a witness, that he was denied his Sixth Amendment right to cross-examine her, that her testimony was unreliable and thus violated both his Eighth Amendment right to a reliable guilt determination and his Fourteenth Amendment right to due process, and that the trial court erred when it failed to instruct the jury to view Wendy's testimony with caution. We reject the contentions.

1. *Competency as a Witness*

To determine her competency as a witness, the judge asked Wendy on voir dire whether she knew the difference between telling the truth and lying, and whether she would tell the truth in responding to questions. Wendy said "yes" to both inquiries, as well as to the question whether it would be a lie if the judge said his [black] robe was white. At that point, the judge said,

"unless I have objection, [the court] is satisfied that she is a competent witness." Wendy was then sworn as a witness.

At the request of defense counsel, the trial court asked Wendy several questions relating to her memory of the night James died. Wendy did not remember that a police officer took her from her house to a hospital. She did, however, recall several events that occurred the night James died, including riding in an ambulance, seeing a doctor, and talking to people while she was with the doctor.

Defendant contends that the trial court abused its discretion in concluding that Wendy was competent to testify, because the trial court's voir dire of her was inadequate to determine whether Wendy was capable of recounting her impressions of the pertinent events, and because the court did not impress upon her that she would be punished if she did not tell the truth.

As a general rule, "every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700; see Pen. Code, § 1321.) A person may be disqualified as a witness for one of two reasons: (1) the witness is incapable of expressing himself or herself so as to be understood, or (2) the witness is incapable of understanding the duty to tell the truth. (Evid. Code, § 701, subd. (a).) The party challenging the witness bears the burden of proving disqualification, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. (*Adamson* v. *Department of Social Services* (1988) 207 Cal.App.3d 14, 20 [254 Cal.Rptr. 667].)

Here, the trial court—through its questioning on voir dire—ascertained that Wendy could distinguish between truth and falsity, and that she understood she had to tell the truth. The court repeatedly impressed upon Wendy the importance of telling the truth, and repeatedly extracted from her a promise that she would do so. Contrary to defendant's assertion, an actual direct threat of punishment for not telling the truth is not a prerequisite for a trial court's determination that a person is competent to be a witness.

We have reviewed Wendy's brief testimony. Some of her statements were inconsistent. On cross-examination, defense counsel challenged those inconsistencies and Wendy's inability to recall some of the details of what had occurred the night of James's death. Inconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. (*Adamson* v. *Department of Social Services, supra,* 207 Cal.App.3d at p. 20.) They present questions of credibility for resolution by the trier of fact. (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 420 [317 P.2d

974]; *Adamson* v. *Department of Social Services, supra,* 207 Cal.App.3d at p. 20; see Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 701, pp. 9-10 [Deering's Ann. Evid. Code (1986 ed.) § 701, pp. 331-332].) The trial court did not abuse its discretion in ruling that Wendy was competent to testify as a witness.

### 2. *Defendant's Other Challenges to Wendy's Testimony*

Defendant's other challenges to Wendy's testimony do not require an extended discussion. There is no merit to defendant's assertion that he was denied his right to cross-examination: defense counsel did cross-examine Wendy.

Also without merit is defendant's claim that his constitutional right to due process under the Fourteenth Amendment and the requirement of the Eighth Amendment that a judgment of death be based on sufficiently reliable evidence were violated because Wendy's testimony was unreliable. Both the federal and the California Constitutions require certain procedure to ensure reliability in the fact-finding process. (*Ford* v. *Wainwright* (1986) 477 U.S. 399, 411 [91 L.Ed.2d 335, 347-348, 106 S.Ct. 2595]; *People* v. *Geiger* (1984) 35 Cal.3d 510, 520 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].) Here, defendant was fully afforded such protections. He was given an opportunity to be heard and to cross-examine in a judicial forum. (*Ford* v. *Wainwright, supra,* 477 U.S. at pp. 413-416 [91 L.Ed.2d at pp. 348-351].)

### 3. *Trial Court's Failure to Give Cautionary Instruction*

We reject defendant's claim that the trial court erred in failing to instruct the jury on its own motion that Wendy's testimony should be viewed with caution. In *People* v. *Thomas* (1978) 20 Cal.3d 457, 471 [143 Cal.Rptr. 215, 573 P.2d 433], we said that the giving of such an instruction was committed to the discretion of the trial court. When, as here, the testimony of a child is involved, the trial court is under no duty to give a cautionary instruction on its own motion.[8] (See *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1209-1210 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776].)

---

[8]After the trial in this case, the Legislature enacted section 1127f. That statute provides that *on request* the court shall, in a criminal case involving the testimony of a child 10 years old or younger, instruct the jury to consider all of the circumstances surrounding the child's testimony. The statute requires, among other things, that the jury be instructed not to "discount or distrust the testimony of a child solely because he or she is a child."

### E. *Prosecutorial Misconduct*

#### 1. *Griffin Error*

In his closing argument to the jury, while arguing the applicability of the instructions to the evidence presented, the prosecutor briefly discussed the instruction that a witness wilfully false in a material part of his or her testimony is to be distrusted in other parts of the testimony. After observing that defendant never admitted killing James or having the intent to kill James, the prosecutor remarked, "[Defendant] was not a witness anyway." Defendant contends that this statement constituted improper prosecutorial comment on his exercise of the Fifth Amendment privilege against self-incrimination.

Defendant did not object to the prosecutor's remark. Its brevity and the unlikelihood of an adverse inference being drawn by the jury indicate that an objection and admonition might have cured any possible harm. Accordingly, defendant may not now raise the issue on appeal. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 947-948 [248 Cal.Rptr. 467, 755 P.2d 917].)

Even if properly before us, defendant's contention is without merit. A prosecutor may not directly or indirectly comment on a defendant's failure to testify in his or her own defense. (*Griffin* v. *California* (1965) 380 U.S. 609, 614 [14 L.Ed.2d 106, 109-110, 85 S.Ct. 1229].) But the prosecutor may comment on the state of the evidence, including the failure of the defense to introduce material evidence or to call witnesses. (*People* v. *Hovey, supra,* 44 Cal.3d at p. 572.)

Here, the prosecutor made the comment at issue in summarizing to the jury what defendant had said in the police interviews, tapes of which were played to the jury during the trial.[9] When considered in light of the evidence before the jury and the context in which it was made, it becomes clear that the prosecutor's statement was not directed at, and would not have been understood by the jury as referring to, defendant's failure to testify.

Moreover, even if we were to accept defendant's characterization of the prosecutor's remark, it was an indirect, brief and mild reference to defendant's failure to testify as a witness without any suggestion of an inference of

---

[9]This quote from the record shows the context in which the statement was made: "For one thing [defendant] never admitted killing, let alone an intent to kill. I argue to you . . . the instruction on willfully false. He was not a witness anyway. Mr. Mincey's credibility is so low in this case that you should disregard basically anything he said about how it happened or what happened. [¶] Deception regarding the facts of the case. Again I'm not going to argue the broader definition, consciousness of guilt. Let's focus in again, did Mr. Mincey through the lies and deceits that he told, did he know he had intended to kill, and the kinds of facts that could allow a prosecution or the police to show that he had? Yes, he did."

guilt. (*People* v. *Hovey, supra,* 44 Cal.3d at p. 572.) Such references have uniformly been held to be harmless error. Under the circumstances in this case, the error was certainly harmless beyond a reasonable doubt. (*Ibid.*; *People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].)

2. *Expression of Personal Belief in Guilt*

In arguing that the prosecutor improperly expressed a personal opinion or belief in defendant's guilt, defendant points to three remarks made by the prosecutor.

The first remark occurred in the prosecutor's opening statement: "I'm not going to specifically describe to you the injuries found on James . . . Junior, the five year old boy. You'll see the photos that have been referred to. Dr. Root's testimony is going to be extremely extensive on that. Suffice it to say I think at the end of the case there will be no serious issue that he was actually tortured to death. You will be wrestling with much different issues by the end of the case."

In the second instance, the prosecutor said in closing argument: "If we took away the blows that Sandra . . . delivered James . . . would still be dead. If we took away the [blows] Bryan Mincey delivered the credible evidence indicates that James . . . would still very likely be alive today. So I think on that issue, it is clear that Mr. Mincey is the most legally culpable. He is the actual, based on the credible evidence, the actual physical perpetrator of the death of James . . . ."

The third comment occurred later in the prosecution's closing argument when he said: "Mr. Whitney [defense counsel] said there's no evidence that [defendant] did everything. I thought I made it clear as many ways as I could the prosecution clearly believes and expects you to believe that Sandra . . . was involved in this beating. We believe and you should believe that [defendant] was the primary perpetrator. There are lots of reasons, but the biggest reason is Wendy's testimony."

██ A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial. (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) The prosecutor's comments must, of course, be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to

the evidence presented at trial. (*People* v. *Green* (1980) 27 Cal.3d 1, 35 [164 Cal.Rptr. 1, 609 P.2d 468].) Each of the prosecutor's remarks challenged here was specifically made in reference to evidence that the prosecutor intended to, and did, introduce at trial. Under the circumstances, there was no substantial risk that the jury would interpret the prosecutor's remarks as referring to information other than evidence adduced at trial.

### 3. *Prosecutor's References to Nonphysical Torture*

Defendant argues that the prosecutor engaged in misconduct by referring to "nonphysical torture" in his opening statement. Defendant cites no authority to support his assertion that the mental aspects of torture are irrelevant in assessing criminal liability for torture murder.

In addition to first degree murder, defendant was also charged with five counts of endangering a child. Unjustifiable infliction of physical pain *or* mental suffering is an element of both felony and misdemeanor child endangering. (§ 273a, subds. (1), (2).) The prosecutor's reference to "nonphysical torture" was appropriate; it referred to matters properly within the scope of the charged offenses.

### 4. *Misconduct During Voir Dire*

Defendant contends that the prosecutor engaged in misconduct during the voir dire of a prospective juror.

These were the relevant remarks by the prosecutor: "To [prove that a five-year-old boy was intentionally tortured to death], I'm going to have to present some extremely unpleasant evidence. I mean, just appalling evidence. [Not] just pictures. Frankly I have attempted to elect pictures that are bad but not as horrible as they could be. [¶] But you're going to hear . . . a pathologist testify and I'm going to ask him to use diagrams and show the injuries, and all of you or most of you have had some general description of the kind of injuries we're talking about. They're terrible. And you might think to yourself I don't want to listen to this. Why is he presenting this awful stuff. Do you think you would do that?"

Defendant asserts that the prosecutor's statements created an improper impression that there existed evidence against defendant of a more damaging nature than the evidence that would be produced at trial. The contention lacks merit.

The prosecutor's remark was brief and the purpose of the inquiry was to ascertain whether the gruesome nature of the evidence might have an

adverse effect on the prospective juror's ability to sit as a fair and impartial juror. When the statements are read in context, it cannot reasonably be concluded that the remark would have any significant impact on the jury; and, even if error, the comment was harmless beyond a reasonable doubt. (See *People* v. *Jackson, supra,* 28 Cal.3d at p. 305.)

F. *Ineffective Assistance of Counsel*

Defendant contends that his trial counsel was ineffective for (1) not arranging to have excised from the tapes of the first two police interviews of defendant certain comments by the police about the physical evidence relating to the murder, statements attributed to Sandra and Wendy, and assertions that defendant was lying; (2) not objecting to the jury's hearing of the tape of the third police interview of defendant; and (3) arguing against defendant's interest.

To establish a claim of ineffective assistance of trial counsel, a defendant must show by a preponderance of the evidence that the attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's conduct, the result of the proceeding would have been different. Courts must in general exercise deferential scrutiny in reviewing such claims; the reasonableness of defense counsel's conduct must be assessed "under the circumstances as they stood" at the time of counsel's acts or omissions; "second-guessing" is to be avoided. (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) Defendant has failed to establish ineffective representation, as we shall discuss.

Before the tapes of the police interviews of defendant were played to the jury, the prosecutor expressed reservations about excising from the tapes certain comments made by the police. The prosecutor explained that the comments at issue in the first two tapes were relatively brief and did add meaning to the answers given by defendant in the interviews. The defense attorney then informed the court that he and cocounsel had weighed the competing considerations in playing the tapes and decided as a matter of trial tactics to let the first two tapes be played in their entirety to the jury. Defense counsel feared that to excise from the tapes the relatively innocuous comments by the police, might lead to speculation by the jury; counsel suggested that the court handle the matter by an admonishment to the jury.

Just before the first tape was played, the court admonished the jury that (1) certain portions of the tape were objectionable, (2) the defense had

waived its objections because "They don't want you to have any questions about anything that their client said during any of these interviews," (3) the police in their efforts to elicit information from defendant made statements that were not true, and (4) any statements made by the police of what other persons had told them could not be used against defendant because they were not made under oath and defendant did not have an opportunity to confront and cross-examine those individuals. Before the second tape was played, the court gave the jury a similar but more factually specific admonition. An abbreviated admonition preceded the playing of the third tape.

 Defense counsel's decision to have the tapes played in their entirety to the jury did not constitute ineffective assistance. The tapes enabled defense counsel to get defendant's version of events before the jury without the necessity of having defendant take the witness stand and subject himself to cross-examination. (See *People* v. *Edwards* (1991) 54 Cal.3d 787, 837-838 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Because defendant had steadfastly maintained in each of the three tape-recorded police interviews that Sandra B. was responsible for James's death, defense counsel's decision not to request that some of the police comments be excised from the tapes was a reasonable tactical choice: from defendant's repeated denial of guilt an inference could be drawn that he was innocent of the murder of James. In any event, defendant's statements about his overall role in the events culminating in James's death were admissible as statements of a party. (Evid. Code, § 1220.)

 In contending that trial counsel argued to the jury against defendant's interest, defendant cites certain remarks by counsel. During voir dire, defense counsel mentioned that people sometimes asked him how he could defend a guilty person; his response was that sometimes his clients were innocent and sometimes they were not, and that it was for the jury, not the attorney, to decide the issue of guilt or innocence. The obvious purpose of these remarks was to alleviate possible bias against criminal defense attorneys. The comments also served to emphasize the importance of the jury's task to apply the law. Contrary to defendant's assertion, counsel did not argue against his client's interest.

The other comment challenged by defendant occurred in opening statement when defense counsel acknowledged that the defense had certain problems to overcome: defendant's inconsistent statements, for instance, could be used to impeach his credibility. Counsel's comment apprised the jury of the weak points in the defense, in an effort to mitigate the potential impact of the evidence that the prosecution was expected to present.

We conclude that defendant has failed to establish ineffective assistance of counsel at trial.

## G. *Felony-murder Instructions*

The trial court instructed the jury that defendant was charged with murder, defined as "the unlawful killing of a human being with malice aforethought or the unlawful killing of a human being which occurs during the commission or attempt to commit a felony inherently dangerous to human life." In that instruction, which did not refer to the degree of murder, the jury was also told that the elements of the offense were (1) that a human being was killed, (2) that the killing was unlawful, and (3) that the killing was done with malice aforethought.[10] Additionally, the trial court instructed the jury on the elements of felony child endangerment; these instructions included references to "circumstances or conditions likely to produce great bodily harm or death . . . ." In his closing argument to the jury, the prosecutor referred to first degree torture murder as a "kind of a variation of a felony murder theory . . . ."

 Defendant correctly notes that felony murder was not in issue, that the case was tried on a theory of first degree torture murder with a special circumstance of torture, and that therefore the trial court erred in instructing the jury on felony murder.

When considered as a whole and when considered with the jury's findings, there is no reasonable probability that the instructions misled the jury. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 972-973 [281 Cal.Rptr. 273, 810 P.2d 131].)

The improper instruction related to the offense of murder, but not its degree. The jury found defendant guilty of first degree murder based on instructions that required it to find premeditation and deliberation or torture murder, or both. In addition, the special circumstance verdict required a jury finding of intent to kill. The jury's first degree murder verdict and its special circumstance finding establish that the jury did not base its conviction on the felony-murder theory. (See *People* v. *Morris* (1988) 46 Cal.3d 1, 24 [249 Cal.Rptr. 119, 756 P.2d 843].)

Although in his closing argument the prosecutor described first degree torture murder as a variation of felony murder, that comment was quite brief and was immediately followed by a reference to the two elements of first degree torture murder (acts that involve high degree of probability of death

---

[10]The instruction was a modified version of CALJIC No. 8.10 (1983 rev.). The trial court modified the standard instruction by deleting the reference to the killing of a fetus and by deleting the following language from the third element of the offense: "occurred during the commission or attempted commission of _____ a felony inherently dangerous to human life. _____ is a felony inherently dangerous to human life."

and committed with intent to cause cruel pain or suffering). Moreover, the jury specifically found that James's murder was committed by defendant with the intent to kill and that the murder involved the infliction of torture.

*People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886], cited by defendant, is distinguishable. There, this court held that felony child endangerment "of the assaultive variety," that is, child abuse by physical assault, was included within second degree murder for purposes of the second degree felony murder rule where the murder conviction was based on the death of the child abuse victim. (*Id.* at pp. 802-807.) Here, however, as discussed above, it is not reasonably probable that the jury based the torture-murder conviction of defendant on the felony-murder theory. (*People* v. *Duncan, supra,* 53 Cal.3d at pp. 972-973.)

H. *Felony Child Endangerment as a Necessarily Included Offense of Torture-murder*

Count 1 of the information charged defendant with the unlawful killing of James with malice aforethought on or about December 23, 1983. That count also alleged the special circumstance that the murder was committed with the intent to kill and that it involved the infliction of torture. Count 3 charged that defendant "did wilfully and under circumstances likely to produce great bodily harm or death cause, permit, and inflict unjustifiable physical pain and mental suffering upon James . . . ."

 Defendant argues that under the language of the accusatory pleading all of the elements of felony child endangerment alleged in count 3 are encompassed by the elements of first degree torture-murder alleged in count 1, and that the conviction on the child-endangerment count must be reversed because it is a necessarily included offense of torture murder. Not so.

When, as here, the accusatory pleading describes an offense in the statutory language, an offense is a necessarily included offense when the greater offense cannot be committed without necessarily committing the lesser offense. (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 99 [192 Cal.Rptr. 748, 665 P.2d 520].) Because the victims of torture murder can be adults, as well as children, it follows that torture murder does not necessarily include child endangerment. (See *In re Hess* (1955) 45 Cal.2d 171, 174 [288 P.2d 5] [forcible rape can be committed without contributing to the delinquency of a minor].)

I. *Child-endangerment Misdemeanor Convictions and Statute of Limitations*

Defendant was convicted of *misdemeanor* child endangerment of James (count 5) and Wendy (count 6). Both counts of the information were based

on acts that had occurred on June 20, 1981, more than two years before James's death.

The complaint, which was filed on January 4, 1984, alleged both counts to be *felonies* (§ 273a, subd. (1)), as did the information, which was filed on May 10, 1984. During trial, the information as to count 5 was amended to allege misdemeanor child endangerment (§ 273a, subd. (2)). Following the judgment of death, the trial court reduced count 6 to a misdemeanor.

Defendant contends that because he was convicted of misdemeanor child endangerment on counts 5 and 6, acts that occurred two years before the murder in this case, the one-year statute of limitations (§ 802, subd. (a)) applicable to misdemeanors bars conviction on these two counts. He is right.

In California, the statute of limitations in a criminal case may be raised as a time bar at any time. (*People* v. *Chadd* (1981) 28 Cal.3d 739, 757 [170 Cal.Rptr. 798, 621 P.2d 837].) If the offense is an alternative felony/misdemeanor (a "wobbler") initially charged as a felony, the three-year statute of limitations for felonies (see § 801) applies, without regard to the ultimate reduction to a misdemeanor after the filing of the complaint. (*People* v. *Superior Court* (*Ongley*) (1987) 195 Cal.App.3d 165, 169 [240 Cal.Rptr. 487].) If, however, the initial charge is a felony but the defendant is convicted of a necessarily included misdemeanor, the one-year limitation period for misdemeanors applies. (§ 805, subd. (b); see 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988), Defenses, § 371, p. 425.)

The child endangerment statute, section 273a, has two subdivisions. Subdivision (1) prohibits wilfully causing or permitting a child to suffer under circumstances likely to produce great bodily harm or death. It provides for alternative punishment by imprisonment either in the county jail or the state prison, thus making the offense a "wobbler." Under subdivision (2), wilfully causing or permitting a child to suffer under circumstances other than those likely to produce great bodily harm or death is a misdemeanor.

In this case, count 5 of the amended information specifically charged defendant under the misdemeanor provision of section 273a, subdivision (2). The record also indicates that the trial court's reduction of count 6 to a misdemeanor was under subdivision (2), not as the misdemeanor alternative under subdivision (1) of section 273a. Thus, the reductions of these counts were based on the offenses as necessarily included misdemeanors and not as the statutory alternatives, that is, "wobblers." Therefore, the convictions on these two counts are barred by the one-year statute of limitations for misdemeanors.

## J. *Cumulative Effect of Errors*

■ Defendant argues that the cumulative effect of the errors in the guilt phase of his trial requires reversal. We disagree. The only significant error pertained to defendant's misdemeanor convictions, which were barred by the applicable one-year statute of limitations. We corrected the error by reversing the misdemeanor convictions. A defendant is entitled to a fair trial, not a perfect one. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 123 [241 Cal.Rptr. 594, 744 P.2d 1127].) In this case, defendant received a fair trial.

## III. SPECIAL CIRCUMSTANCE ISSUES

### A. *Vagueness of Torture Special Circumstance*

■ Citing *Maynard* v. *Cartwright* (hereafter *Maynard*) (1988) 486 U.S. 356 [100 L.Ed.2d 372, 108 S.Ct. 1853], defendant asserts that the special circumstance of torture is unconstitutionally vague as applied here because it fails to provide a principled way to distinguish this case, where the death penalty was imposed, from the "many cases in which it was not."

In *Maynard*, the United States Supreme Court held unconstitutional, on the ground of vagueness, an aggravating circumstance that allowed the imposition of the death penalty when the murder was "especially heinous, atrocious, or cruel." The high court pointed out that because the language of the aggravating circumstance had not been construed narrowly it did not adequately inform juries what they must find to impose the death penalty. (486 U.S. at pp. 363-364 [100 L.Ed.2d at pp. 381-382]; accord, *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 429, 432 [64 L.Ed.2d 398, 408-409, 100 S.Ct. 1759]; *People* v. *Superior Court* (*Engert*) (1982) 31 Cal.3d 797, 806 [183 Cal.Rptr. 800, 647 P.2d 76]; *Proffitt* v. *Wainwright* (11th Cir. 1982) 685 F.2d 1227.)

The narrowing construction absent in *Maynard* is present here. In *People* v. *Davenport, supra,* 41 Cal.3d at page 271, this court construed the torture special circumstance as requiring proof that the defendant intended to kill and torture the victim, and inflicted extreme pain upon a living victim. Thus, unlike the vaguely worded aggravating circumstances of "especially heinous, atrocious, or cruel" (*Maynard, supra,* 486 U.S. 356), the torture special circumstance involved here has been construed narrowly by this court and its constitutionality has been upheld. (*People* v. *Davenport, supra,* 41 Cal.3d at pp. 266-271; *People* v. *Wade, supra,* 44 Cal.3d 975, 993-994.)

### B. *Torture Special Circumstance Instruction*

Defendant contends that the torture special circumstance finding must be reversed because the trial court did not instruct the jury on the element of intent to torture.

The trial court gave the standard instruction on deliberate and premeditated murder (CALJIC No. 8.20 (4th ed. 1979 rev.)), and also gave an instruction on first degree torture murder. The latter included this language on intent to torture: "[T]he defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose." (CALJIC No. 8.24 (4th ed. 1979).) In addition, the court instructed the jury that first degree torture murder was murder committed "with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain."

On the torture special circumstance, the jury received this instruction: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. That the murder was intentional, and [¶] 2. That the murder involved the infliction of torture. [¶] To prove the infliction of torture, the infliction of extreme physical pain must be proved no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." (CALJIC No. 8.81.18 (4th ed. 1979).)

In his closing argument, the prosecutor used two charts. One of the charts outlined the elements of first degree torture murder and the torture special circumstance.[11] The prosecutor also argued, "our facts are so broad and so directly on point, I believe there's no difference for purposes of these two definitions of torture." During deliberations, the jury asked for a reading of the transcript "concerning [the prosecutor's] chart used in summation concerning definitions of intent." The court reporter then read to the jury the language of the chart (see fn. 11, *ante*).

■■ Although the torture special circumstance instruction did not explicitly state that the "infliction of torture" element of the special circumstance included a requirement of an intent to inflict cruel pain, we conclude there is no reasonable likelihood that the jury in this case understood the instruction as not requiring it to find intent to torture. (*Estelle* v. *McGuire* (1991) 502 U.S. __, __ [116 L.Ed.2d 385, 399, 112 S.Ct. 475, 482]; *Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 329, 110 S.Ct. 1190, 1198]; *People* v. *Wade, supra,* 44 Cal.3d at p. 994.)

---

[11]The prosecutor's chart read as follows: "[¶] Law. [¶] I. First Degree Torture Murder. [¶] One, the act or acts which caused the death must involve a high degree of probability of death; [¶] And two, the defendant must commit such act or acts with the intent to cause cruel pain or suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. [¶] First degree torture murder does not necessarily require any proof the defendant intended to kill. [¶] II. Torture Special Circumstance. [¶] One, that the murder was intentional; [¶] and two, that the murder involved the infliction of torture. [¶] To prove the infliction of torture, the infliction of extreme physical pain must be proved no matter how long its duration."

The torture special circumstance instruction required the jury to find that the murder was intentional and "involved the infliction of torture." As this court observed in *People* v. *Davenport, supra,* 41 Cal.3d at page 271, the word "torture" necessarily implies an intent to torture. Here, the intent-to-torture requirement was explicitly set forth in the instruction on first degree torture murder and reiterated in the prosecutor's chart; also, in his closing argument the prosecutor told the jury, correctly, that the definition of torture for purposes of first degree torture murder was the same as its definition for purposes of the torture special circumstance (*People* v. *Wade, supra,* 44 Cal.3d at pp. 994-995). Furthermore, the jury's request for a reading of the transcripts "concerning [the prosecution's] chart" on the definition of intent in first degree torture murder and with regard to the torture special circumstance indicates that the jury's focus was on murder by torture, not premeditation and deliberation. In this case, as in *People* v. *Wade, supra,* 44 Cal.3d at page 994, the commonsense understanding and import of the term "torture," which implies an intent to torture, was affirmatively reinforced to the jury. (Compare *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254-1255 [278 Cal.Rptr. 640, 805 P.2d 899].)

■ We also reject defendant's argument that the torture special circumstance should not apply when the first degree murder is a torture murder, or when the victim is a child whom the accused could lawfully discipline. As discussed earlier, we have construed the torture special circumstance to satisfy the requirements of the Eighth Amendment. (*People* v. *Davenport, supra,* 41 Cal.3d at pp. 265-271.) A further narrowing or limiting of this special circumstance, as defendant has suggested, is not constitutionally mandated, and must be accomplished, if at all, by legislative action.

## IV. JURY SELECTION ISSUES

■ Defendant contends that during jury selection the trial court erred in excluding a prospective juror and in overruling defendant's "for cause" challenge to three other prospective jurors.

■ The legal standard for evaluating the propriety of the exclusion or inclusion of a prospective juror is the same. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 765 [251 Cal.Rptr. 83, 759 P.2d 1260].) A challenge to a prospective juror should be sustained when the juror's views would "prevent or substantially impair" the performance of his or her duties as a juror in accordance with the instructions and oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; see *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination is binding on the reviewing court.

(*People* v. *Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Here, Virginia H., the excluded juror, said that there were no conceivable circumstances under which she would vote to impose the death penalty. This response showed that her views would "prevent or substantially impair" her performance as a juror. Her exclusion was therefore proper.

Juror B., one of the three challenged for cause by the defense, responded on voir dire that although he favored the death penalty and would vote for its imposition in a case of extreme torture, he would consider the aggravating and mitigating circumstances and could vote for life imprisonment without the possibility of parole if the circumstances in mitigation outweighed those in aggravation.

Juror G. said that he would vote for the death penalty if defendant had intentionally killed and intentionally inflicted torture, but that he would consider the evidence and vote for guilt or innocence either way depending on the facts. (Defendant eventually exercised a peremptory challenge against G.)

Juror V. stated that she generally favored the death penalty but would not vote to impose it in every case. She further responded that she could be persuaded to vote for life imprisonment depending on the circumstances, and that mitigating evidence of mental disability would be appropriate in considering whether to impose a sentence of life or death.

In overruling defendant's challenges "for cause" to these three jurors, the trial court acted properly. The statements of these jurors did not indicate that their views would substantially impair the performance of their duties as jurors. (*People* v. *Ghent, supra,* 43 Cal.3d at pp. 767-768.)

Defendant also contends that his defense counsel rendered ineffective assistance by failing to peremptorily challenge Jurors B. and V. As a result, defendant asserts, he was left with two "pro-death" jurors. In the preceding paragraph we disagreed with defendant's characterization of these jurors. Accordingly, we reject defendant's contention that his counsel was ineffective for not peremptorily challenging Jurors B. and V. (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.)

## V. PENALTY PHASE FACTS

### A. *Prosecution Evidence*

Sandra B., the prosecution's sole witness at the penalty phase, gave the following testimony:

Sandra B. had never caught the children engaging in any sexual activity, as defendant claimed he had.

On the day on which five-year-old James was killed, both Sandra B. and defendant had taken approximately three quarters of a gram of amphetamines. In the morning, defendant beat James and four-year-old Wendy with a belt five or six times for wetting the bed. Sandra then made the children sit on the floor with their legs crossed for approximately two and one-half hours.

Later in the day, when Wendy was on the toilet, defendant violently pulled her off it and smeared feces on her face. Defendant then took Wendy into the shower, where he hit her head against the tile. Thereafter, defendant beat the two children nine to fifteen times with a belt. In the evening, apparently irritated by the children's response to a question, defendant beat them with a cartridge belt. James's blood splattered on the bed and on defendant's pants. When James began to cry, defendant punched him in the stomach with his fist.

Around 9:30 p.m., the children were put to bed. Each time they moved their legs, defendant would hit them with the cartridge belt. When James did move, defendant took a board and hit him on the genitals, shoulders, head, and back.

During the beatings, James had a bowel movement. Defendant took him into the bathroom and hit James's head against the shower wall. Defendant then placed his finger up James's rectum, made James eat feces, and kept hitting James with the board. Blood came through James's pants and got on the board. When James and Sandra begged defendant to stop, defendant said he would stop when his arm got tired. Eventually, defendant threw James against the wall and he slid down the wall. When James could not sit up, Sandra B. took him into the shower where he seemed to revive. She then wrapped him in a blanket. Not long thereafter, James stopped breathing. When Sandra attempted to leave the house to get help, defendant grabbed her and told her they could handle the matter themselves. Sandra nevertheless went to the neighbors, who called the paramedics and the police.

Sandra B. testified that she had not been promised, and did not expect to receive, anything in exchange for her testimony.

B. *Defense Evidence*

The first witness called by the defense was the prosecuting attorney. He testified as follows: He had recommended the filing of a special circumstance allegation against defendant, but not against Sandra B. He decided to

seek the death penalty against defendant, but not Sandra for three reasons: Sandra was remorseful, while defendant was not; Sandra cooperated with the police from the beginning, while defendant did not; and he believed that defendant, not Sandra, was the actual killer. As he understood the law to be, the special circumstance could be alleged only against the actual killer.

The next defense witness was Phillip Walz, a convicted murderer serving a sentence of life without possibility of parole at Folsom prison. He testified that prisoners live like dogs in kennels, and that life in prison resembled a racial war.

Michael and Carla Brown, who were friends of both defendant and Sandra B., said that they had never seen defendant treat the children in a brutal manner, and that it was Sandra who beat the children.

Kelly Burkhart, defendant's stepbrother, testified that the children liked defendant, that he had seen defendant with cuts and bruises after defendant and Sandra B. had had a fight, and that Sandra would tell defendant to spank the children harder.

Defendant's stepfather, Marion Burkhart, stated that defendant had in the summer of 1975 worked for Burkhart's father on a ranch in Colorado, and that defendant had been a good worker who did not create any problems. Burkhart also said that Sandra B. was the aggressor in the altercations that occurred between defendant and Sandra, that in 1981 Sandra had hit James with a table leg, that defendant was arrested for child abuse based on the incident, and that Sandra told an attorney hired to defend defendant against the child abuse charges that she had lied when she accused defendant of abusing the children that day.

Betty Burkhart, defendant's mother, testified that when defendant was a child his real father wanted to sell him to a childless couple, and that the information Dr. Forbes had attributed to her at the guilt phase was correct.

Defendant's father testified that he had made no effort to contact defendant.

## C. *Prosecution Rebuttal*

The prosecution called Sergeant David Baker as a rebuttal witness. He testified that Carla Brown had mentioned to him that she was told by Sandra B., before James died, that Sandra and defendant were not speaking to each other and that defendant was going to move out.

## VI. PENALTY PHASE ISSUES

Defendant has raised numerous contentions pertaining to the penalty phase of his trial.

### A. *Sandra B.'s Testimony*

 Defendant contends that "manipulation" by the prosecution led Sandra B. to assert her Fifth Amendment privilege against self-incrimination when defendant called her as a witness at the guilt phase, but to waive the privilege when the prosecution called her as a witness at the penalty phase.

A defendant's constitutional rights to compel the attendance of witnesses, as guaranteed by the Sixth Amendment, and to due process, as guaranteed by the Fourteenth Amendment, are violated when the prosecution interferes with the defendant's right to present witnesses. (*In re Martin* (1987) 44 Cal.3d 1, 29-30 [241 Cal.Rptr. 263, 744 P.2d 374].) The defendant, however, bears the burden of showing that the prosecutor's conduct was entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify. In addition, the defendant must establish interference, that is, a causal link between the prosecutorial misconduct and the defendant's inability to present the witness. (*Id.* at p. 31.)

In this case, defendant has failed to establish prosecutorial misconduct. Sandra B.'s trial was severed from defendant's, and she was independently represented by counsel. At the guilt phase, she asserted her privilege against self-incrimination on the advice of her attorney, not because the prosecutor had told her to do so. Nor did the prosecutor's testimony, in which the prosecutor disclosed the substance of his discussions with Sandra's attorney, indicate any interference with defendant's constitutional right to present the testimony of witnesses.

### B. *Trial Court's Failure to Give Accomplice Instructions*

Defendant contends that the trial court erred in failing to give accomplice instructions. As noted earlier, Sandra B. testified at the penalty phase. She had been charged in the same complaint as defendant and for the same offenses, with the exception of the special circumstances allegation. She testified at the penalty phase to the circumstances surrounding defendant's arrests in 1981 and 1983 for child abuse, as well as to the subsequent circumstances culminating in James's death.

The trial court did not instruct the jury that Sandra B. was an accomplice whose testimony should be corroborated and viewed with distrust. (See

CALJIC Nos. 3.11, 3.12, 3.16, 3.18 (4th ed. 1979 rev.).) The court did, however, instruct the jury that testimony by a single witness should be carefully reviewed but would be sufficient to prove a fact (CALJIC No. 2.27 (4th ed. 1979 rev.)), and earlier, at the guilt phase, the court instructed the jury not to speculate as to why another person involved in the crime (Sandra) was not being prosecuted in this trial (CALJIC No. 2.11.5).

■ Defendant contends that the trial court erred in failing to instruct on its own motion that if Sandra B. was an accomplice her testimony should be viewed with distrust, and that her testimony must be corroborated. (See § 1111.) We agree. When the prosecution calls an accomplice as a witness, the trial court must instruct the jury that the witness's testimony should be viewed with distrust. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1314 [756 P.2d 221].) This rule applies to both the penalty and the guilt phases of a death penalty case. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 100.) In addition, when the prosecution seeks to introduce evidence of the defendant's unadjudicated prior criminal conduct, the jury should be instructed at the penalty phase that accomplice testimony must be corroborated. (*People* v. *Easley* (1988) 46 Cal.3d 712, 734 [250 Cal.Rptr. 855, 759 P.2d 490].)

In this case, the trial court's failure to instruct the jury that it should view Sandra B.'s testimony with distrust did not prejudice defendant. From the evidence presented, it must have been apparent to the jury that Sandra had a motive for inculpating defendant and exculpating herself. The jury was told that Sandra was a participant in the events leading to James's killing; that both she and defendant were charged with murder based on the same events; that her case was trailing defendant's; and that her case might be decided by the court, rather than a jury, based on the record of the proceedings in this case. Moreover, in his closing argument to the jury, the prosecutor said he did not believe that everything Sandra had said was true, and it would be for the jury to determine her credibility. Under these circumstances, it is not reasonably possible that the jury would have reached a result more favorable to defendant had it been instructed to view Sandra's testimony with distrust. (*People* v. *Edwards, supra,* 54 Cal.3d at pp. 843-844; see *People* v. *Gordon* (1973) 10 Cal.3d 460, 472-473 [110 Cal.Rptr. 906, 516 P.2d 298]; *People* v. *Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828].)

■ Similarly nonprejudicial was the trial court's failure to instruct the jury that accomplice testimony must be corroborated. Failure to do so is harmless when there is sufficient corroborating evidence in the record. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 100.) Here, where the evidence tending to connect defendant to the crime was overwhelming, there was ample corroboration. Sandra B.'s testimony was corroborated by other witnesses at the guilt phase, and by the physical evidence linking defendant to

the crimes. Under these circumstances, the error did not result in an arbitrary or capricious judgment violative of the defendant's rights under the Eighth and Fourteenth Amendments of the federal Constitution.

■■■ Equally unavailing is defendant's argument that the challenged failure to instruct was prejudicial because of the trial court's instruction at the penalty phase that the testimony of one witness was sufficient to prove a fact (CALJIC No. 2.27 (4th ed. 1979 rev.)), and because of the court's previous instruction at the guilt phase that the jury should not speculate whether the other person involved in the crime (Sandra) had been or would be prosecuted (CALJIC No. 2.11.5).

In this case, CALJIC No. 2.27 (4th ed. 1979 rev.) was not likely to mislead the jurors. (See *People v Williams, supra,* 45 Cal.3d at p. 1313.) By the time Sandra B. testified and the jury was given CALJIC No. 2.27, the jury had already found that defendant was guilty of first degree murder, that he was the actual killer, and that the murder was accomplished by means of torture. (See *People v. Easley, supra,* 46 Cal.3d at p. 734.) Thus, Sandra's testimony at the penalty phase that defendant was the primary perpetrator of James's killing was cumulative of what the jury had already found to be true at the guilt phase, at which Sandra did not testify.

With respect to CALJIC No. 2.11.5 (4th ed. 1979), the giving of that instruction at the guilt phase could not have been prejudicial at the penalty phase. The jury was told at the penalty phase that Sandra B. was also charged with murder, that her case was trailing defendant's, and that her criminal liability might be decided by the court without a jury based on the record of this trial.[12]

C. *Challenges to Exclusion of Evidence*

1. *Sandra B.*

Defense counsel commenced his cross-examination of Sandra B. by asking her a number of questions relating to her trial. She replied she did not know if she was going to have a jury trial. She asserted the attorney-client privilege in response to questions whether it was her understanding that the prosecutor would argue for second degree murder and that her trial might be decided by the court (sitting without a jury) based on the transcribed

---

[12]Also meritless is defendant's assertion that the accomplice instructional error was prejudicial because the prosecutor "vouched" for Sandra's credibility. When called as a witness by the defense, the prosecutor testified that he did not seek the death penalty against Sandra because he did not believe she was the actual killer. Nothing in the prosecutor's statement indicates that he "vouched" for Sandra's credibility as a witness.

proceedings in this case. She again asserted the attorney-client privilege when defendant's counsel asked her whether her attorney had told her of the penalty for second degree murder, whether she had discussions with the prosecutor or her attorney about being prosecuted for manslaughter, and whether she already had waived her right to a jury trial or intended to do so.

Defendant contends that Sandra B.'s assertion of the attorney-client privilege violated his Sixth Amendment right to confrontation, his Eighth Amendment right to a reliable verdict, and his Fourteenth Amendment right to present all relevant mitigating evidence.

Generally, the Sixth Amendment right to confrontation encompasses inquiry into a witness's bias or motivation for testifying. (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 678-679 [89 L.Ed.2d 674, 682-683, 106 S.Ct. 1431].) The attorney-client privilege, on the other hand, applies to discussions between a witness and the witness's attorney relating to possible plea bargains. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1228 [255 Cal.Rptr. 569, 767 P.2d 1047]; accord, *Brookings* v. *State* (Fla. 1986) 495 So.2d 135, 140 [right to cross-examine does not extend to witness's conversations with attorney]; compare *State* v. *Hembd* (1975) 305 Minn. 120 [232 N.W.2d 872] [confrontation clause negates doctor-patient privilege]; *State* v. *Farrow* (1976) 116 N.H. 731 [366 A.2d 1177] [same].)

Here, to the extent defense counsel's questions related to Sandra B.'s understanding or state of mind, the trial court erred in upholding her assertion of the attorney-client privilege. Such questions are properly addressed to bias, because a witness's belief that his or her testimony will result in a lenient sentence is relevant to the witness's credibility.

The error, however, was harmless beyond a reasonable doubt, for the jury had before it ample information of the possible bias of Sandra B. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 48-49 [222 Cal.Rptr. 127, 711 P.2d 423]; see also *Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 684 [89 L.Ed.2d at pp. 686-687].) In his opening statement at the penalty phase, the prosecutor told the jury that Sandra's case was pending in the same court and that she would probably have a court trial. In closing argument, the prosecutor noted that Sandra and her lawyer "may have some hope of getting something out of this." Defense counsel in his closing argument reiterated what the prosecutor had said before: that Sandra would face a court trial, that her case would be submitted on the transcripts of the proceedings in this case, and that the prosecutor might argue only for second degree murder. Thus the jury was sufficiently apprised of any possible bias by Sandra.

The questions relating to what Sandra B.'s attorney had told her, however, were subject to the attorney-client privilege insofar as they sought disclosure

of the substance of confidential communications and were not necessary in ascertaining bias. (*People* v. *Garrison, supra,* 47 Cal.3d at pp. 774-775.)

 There is no merit to defendant's argument that the sentence Sandra B. might have hoped to receive was relevant to the jury's sentencing decision regarding defendant. The sentence of a codefendant is not relevant to a capital defendant's penalty determination. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 810-813 [248 Cal.Rptr. 126, 755 P.2d 310].)

We reject defendant's argument that the trial court violated a number of his constitutional rights by sustaining an objection when the defense asked Sandra B. if she had ever displayed a handgun in the presence of a person named Tirvett. The trial court's ruling was proper. The question did not relate to any of the issues in this case. Thus, it was of marginal relevancy and would unduly consume time. (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 679 [89 L.Ed.2d at p. 683]; Evid. Code, § 352.)

Defendant's remaining contentions find no support in the record.

### 2. *Philip Walz*

 The defense called as a witness Philip Walz, a convicted murderer serving a life term without possibility of parole, to testify about the conditions of prison life. Before that testimony, the defense made an offer of proof that Walz would testify about conditions of prison life, including the treatment of child murderers by other prisoners. The court voiced concern that the jury might vote for the death penalty if it thought that defendant, because of the nature of his crimes, faced a life in prison worse than death. After further discussion, defense counsel said that he decided not to inquire into the subject. In view of the court's concern mentioned above, this was an informed tactical decision by defense counsel and therefore did not constitute ineffective assistance of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### 3. *Motion to Reopen*

The prosecution and the defense rested their cases on May 7, 1985. The next morning, the defense moved to reopen on the ground that the parents of defendant's stepfather had arrived from Colorado and proposed to testify that defendant's behavior during his stay in Colorado in the summer of 1975 was exemplary, and that defendant had worked very hard for neighbors of the

parents of defendant's stepfather that summer.[13] Defense counsel explained that the testimony would be "along the same lines" that defendant's stepfather had already testified. Finding the proposed testimony to be cumulative, the trial court denied the motion. ■ Defendant contends that the court's ruling violated his Eighth Amendment right to present mitigating evidence.

Because the proposed testimony was similar to what defendant's stepfather had already testified to, the trial court's denial of defendant's motion to reopen was well within its discretion. (*People* v. *Green, supra,* 27 Cal.3d at p. 42.)

### 4. *Offered Plea Bargain*

■ Defendant contends the trial court erred in excluding evidence that defendant had been offered a sentence of life without possibility of parole if he would agree to submit the case on the transcript of the preliminary hearing. The contention is not supported by the record. At no time did defendant offer to introduce evidence of plea negotiations. The subject of plea negotiations did not arise until after both the prosecution and the defense had rested. The trial court's admonition at that time that the attorneys should not refer to negotiations in closing arguments did not, contrary to defendant's assertion, preclude the defense from introducing such evidence before closing argument.

### D. *Jury Misconduct*

At the end of the first day of the penalty phase deliberations, the bailiff noticed that a juror had a Bible in the jury room, and he so informed the trial court. The next morning, before the jurors recommenced their deliberations, the court questioned each of the jurors in chambers in the presence of the prosecutor and defense counsel.

Juror H., the first juror questioned, said that the previous day she had brought a Bible into the jury room after the lunch recess. When the trial court asked what use had been made of the Bible, Juror H. responded: "We were all finished and we were all getting ready to go home and some people kept making references to the Bible, and I said, well, I have it right here. And I go, do you all want—whoever wants to go can go, whoever wants to

---

[13]The defense motion was also based on a tape recording made by defendant's mother, Mrs. Betty Burkhart. Defendant does not challenge the trial court's ruling that the tape recording was cumulative.

stay can stay. So everybody stayed and so we read a few verses from it."[14] Juror H. explained: "[P]eople know clearly how I feel, and so reading the [N]umbers verse they knew definitely how I felt about reading it, so it was like they knew it was a hard thing for me to read it, but I just felt like I needed to clear up that the Bible is not—there's different views that come from the Bible that people get, so that was—that was my point." Juror H. said that there was no further discussion about the case or the verses after the verses were read.

The other jurors confirmed that the Bible verses had been read. Nine of the jurors confirmed that the day's deliberations were over when the verses were read; two jurors denied that deliberations had ended at the time in question. None of the jurors said that the reading of the verses had influenced their deliberations.

Following the trial court's examination of the jurors, defense counsel informed the court that he would not move for a mistrial. At that point, the trial court made these findings: "[Juror H.'s] fellow jurors' approach to their deliberations has not been affected by [the reading of the Bible verses]. It may be deemed to disclose to us Ms. H.'s approach, but beyond that—and this is not anything which would justify discharging the jury. There is no motion for mistrial. I find no harm, no denial of any protection."[15] Defense counsel then mentioned that he might move to excuse Juror H. and to

---

[14]Juror H. read Numbers, chapter 35, verses 16 and 21; and Romans, chapter 13, verses 1 through 5.

Numbers, chapter 35, verse 16 says: "But if he struck him down with an iron object, so that he died, he is a murderer; the murderer shall be put to death."

Romans, chapter 13, verses 1 through 5 states: "Let every person be in subjection to the governing authorities. For there is not authority except from God, and those which exist are established by God. [¶] Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnation upon themselves. [¶] For rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of Authority? Do what is good, and you will have praise from the same. [¶] For it is a minister to God to you for good. But if you do what is evil, be afraid; for it does not bear the sword for nothing; for it is a minister of God, an avenger who brings wrath upon the one who practices evil. [¶] Wherefore it is necessary to be in subjection, not only because of wrath, but also for conscience sake."

Numbers, chapter 35, verse 21 reads: "Or if he struck him down with his hand in enmity and as a result he died, the one who struck him down shall surely be put to death."

[15]The dissent asserts that Juror H. read the verses "in an evident attempt to prove that defense counsel was 'misstating' God's 'law'." (Dis. opn., *post*, p. 484.) The record, however, does not support the dissent's characterization of Juror H.'s reading of the verses. Juror H. informed the trial court that her purpose in reading the verses was to show that the Bible supports different views, not that it commanded the imposition of the death penalty or that defense counsel's invocation of the Sixth Commandment was erroneous. Juror H. explained to the trial court, "but I just felt like I needed to clear up that the Bible is not—there's different views that come from the Bible that people get, so that was—that was my point."

substitute an alternate, but that he first wanted to discuss it with his associate and with his cocounsel. The court replied that the defense could "reserve" the motion. (The defense, however, never made such a motion.)

Thereafter the trial court admonished the jury as follows: "The jurors had at the conclusion of their deliberations access to a Bible yesterday. I admonish you again, do not take anything into the jury room with you. No reference works of any kind, no verses, no poems, no newspapers, no anything. You are required by the law of the State of California to decide this case on the basis of the evidence adduced here in court and the law of the State of California. What you have that you bring with you from your background, your heritage, your training, of course, you bring to bear. But do not take any other types of reference materials with you."

■ Defendant now contends the trial court erred in not excusing Juror H. from further service or not declaring a mistrial. Alternatively, defendant argues his counsel was ineffective for not seeking the removal of Juror H. We disagree.

It is misconduct for a juror to consider material (§ 1137) extraneous to the record. (See e.g., *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1156 [245 Cal.Rptr. 635, 751 P.2d 901].) Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred. (*People* v. *Williams, supra,* 44 Cal.3d at p. 1156.) In criminal cases, the presumption of prejudice is rebutted when there is no substantial likelihood that the vote of one or more of the jurors was influenced by exposure to the improper material. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].) A trial court's decision whether good cause exists to excuse a juror or to discharge a jury is within its discretion. The court's decision will be upheld on appeal if there is any substantial evidence to support it. (*People* v. *Burgener, supra,* 41 Cal.3d 505, 520, quoting *People* v. *Van Houten* (1980) 113 Cal.App.3d 280, 288 [170 Cal.Rptr. 189].)

Promptly upon learning of the Bible incident, the trial court in this case questioned each of the jurors. The jurors said that the Bible verses were read after the completion of deliberations for the day, and that they did not discuss the Bible verses. Before allowing the jurors to resume deliberations, the trial court admonished them to decide the case solely on the evidence and the court's instructions on the law. Under these circumstances, there was no substantial likelihood that the incident prejudiced defendant. (*People* v. *Holloway, supra,* 50 Cal.3d at pp. 1111-1112.) For the same reasons, we reject defendant's argument that this incident violated his Eighth Amendment rights: the reliability of the jury's decision to impose the death penalty was not significantly impugned by the reading of the Bible verses.

■ There is no merit to defendant's claim that his counsel was ineffective for not seeking the removal of Juror H. Defense counsel knew from the voir dire of Juror H. that she had close religious affiliations but did not have strong feelings about the death penalty. Indeed, by invoking religious precepts in his closing argument, defense counsel appears to have addressed the very sentiments that Juror H. earlier expressed in voir dire. Thus, counsel told the jury that the laws of God are absolute, that the Sixth Commandment says "thou shall not kill," and that he did not "know of any exemption granted to the State of California by the Sixth [Commandment] permitting the state to kill." Under these circumstances, we cannot conclude that defense counsel's decision had no rational tactical basis for not seeking the removal of Juror H.

### E. *Juror's Inquiry About Automatic Appeal*

At the start of the penalty phase trial, before the introduction of evidence and before jury deliberations, Juror V. asked the court three questions. The one at issue here asked: "Is there an automatic appeal to a higher court after a death sentence verdict?"

After discussing the inquiry among themselves, the court and the attorneys for both sides talked to Juror V. outside the presence of the other jurors. Juror V. said that he had not discussed any of his questions with the other jurors. The court told Juror V. that it was not permitted to respond to the question regarding the automatic appeal, adding: "You are required to address [the penalty] phase as you did the [guilt] phase, without reference to anything that may transpire later." At that point, Juror V. interrupted the court, saying: "Some comments had been made to that effect without discussion. As a matter of fact, some comments had been made to the first question without discussion." The court told the juror, "Well if that ever comes up, the question of what happens after the penalty phase is a matter which the jury is simply not allowed to consider."

■ Defendant contends the trial court erred in (1) failing to instruct the entire jury not to consider the availability of appellate review, (2) failing to instruct the jury that the law allows for an appeal from either the guilt or the penalty verdicts, and (3) "deputizing" Juror V. to explain a question of law to the other jurors.

Defendant's contentions are based on the assumption that the jury as a whole, as opposed to a single juror, raised the question of the availability of an automatic appeal. The record, however, supports the trial court's implied finding that it was only Juror V., not the jury as a whole, that had sought

clarification of the "automatic appeal" issue. The question appeared on writing paper with Juror V.'s name. Juror V. informed the court that the question was simply something that had occurred to him, and that he did not discuss the question with the other jurors. Given the circumstances surrounding Juror V.'s inquiry, the trial court was under no duty to give, on its own motion, a cautionary instruction. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 155-159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d 430].)[16]

Also without merit is defendant's claim that the trial court had improperly told Juror V. to disregard the consequences of the penalty verdict. The court did not do so. There is no substantial likelihood that the trial court's admonition to Juror V., before the presentation of evidence and the giving of instructions, to determine penalty "without reference to anything that may transpire later" could have been understood by Juror V. as ameliorating the responsibility for the life-and-death decision. (See *People* v. *Holloway*, *supra*, 50 Cal.3d at p. 1109.) Nor did the trial court "deputize" Juror V. to explain the law to other jurors. The court did not instruct the juror to do so. The court correctly told the juror that the jury could not consider what would happen after the penalty phase.

### F. Definitions of Aggravation and Mitigation

At the commencement of its penalty phase deliberations, the jury asked the trial court for either a legal dictionary or a legal definition of the terms mitigation and aggravation. After conferring with the attorneys, the court told the jurors it would be improper for them to have a dictionary or to do independent research on the meaning of the terms. The court added it would supply the jury with another copy of the jury instruction that had already been given and that set forth the factors for the jury's consideration. (CALJIC No. 8.84.1 (4th ed. 1979).) The court emphasized that it would be improper for the jurors to attempt to define the terms aggravation and mitigation beyond the factors mentioned in the instruction.

The next morning, over the objection of defense counsel, the trial court read to the jury the meaning of aggravation and mitigation, as defined in Black's Law Dictionary. Aggravation was defined as: "Any circumstance attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences but which is above and beyond the essential constituents of the crime itself." Defendant contends that this definition improperly encouraged the jury to consider nonstatutory aggravating factors. We disagree. In previous decisions, this court has upheld the

---

[16]Defendant's argument that his attorney did request that the jury be instructed not to consider the availability of appellate review finds no support in the record. In this regard, the record shows defense counsel's comment that if one of the jurors was thinking of the issue of subsequent appellate review, other jurors were probably thinking of it too. The other defense attorney then remarked that Juror V. should be questioned first. These comments by defense counsel do not constitute a request for an instruction.

propriety of the same definition of aggravation given here. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 269 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 77-78 [246 Cal.Rptr. 209, 753 P.2d 1]; see also *People* v. *Marshall, supra,* 50 Cal.3d at pp. 936-937.)

Defendant also complains that the trial court's definition of mitigation improperly restricted the jury's consideration of mitigating factors to those related to the offense. Mitigation was defined as: "Alleviation, abatement or diminution of penalty or punishment imposed by law reducing, diminishing, or lessening the amount of penalty or punishment." The definition did not restrict the jury's consideration of mitigating factors. But, as defendant points out, the definition's reference to "punishment imposed by law" could have been construed by the jury as suggesting that the penalty of death was the standard penalty in a capital case. This portion of the definition was therefore improper. The error, however, did not prejudice defendant.

Although the definition of mitigation was read to the jury once, the trial court twice—before and during deliberations—instructed the jury pursuant to CALJIC No. 8.84.1 (4th ed. 1979), which enumerated the various factors that the jury could consider in its determination of penalty. In addition, the jury was instructed that the prosecution had the burden of proving the existence of aggravating factors beyond a reasonable doubt, and that if the jury determined that the aggravating circumstances outweighed the mitigating circumstances it could return a sentence of death, but that if the jury determined that the mitigating circumstances outweighed the aggravating circumstances it must impose a sentence of life without possibility of parole. Under these circumstances, the trial court's error in giving the definition of mitigation was harmless under any standard. (See *People* v. *Hamilton* (1988) 46 Cal.3d 123, 148-149 [249 Cal.Rptr. 320, 756 P.2d 1348].)

### G. *Ineffective Assistance of Counsel*

Defendant claims that in his closing argument his trial counsel encouraged the jury to impose a sentence of death, thus rendering ineffective representation. Defendant's argument is based on a mischaracterization of the record: he has taken certain statements of defense counsel out of the context in which they were made.

For example, defendant focuses on this statement made by his attorney: "The laws of God I believe are absolute, and ultimately Bryan [defendant] is going to deal with a much higher authority than you . . . ." Defendant asserts that this statement demonstrates ineffective assistance because it suggests the inevitability of defendant's death and because it "could have

been construed as relieving the jurors of their responsibility, since God would be the real judge . . . ." But trial counsel's immediately preceding statement, which defendant ignores, shows that counsel argued against imposition of the death penalty: "I also have a personal belief that the laws of God are very absolute, that the Sixth Commandment which says thou shalt not kill is a very absolute rule. It reflects the values of western culture that tell us that human life is very sacred, and I don't know of any exemption granted to the State of California by the Sixth [Commandment] permitting the state to kill."

With respect to defendant's contention that his counsel should have asked the jury to consider evidence of defendant's below-average intelligence as a circumstance in mitigation, he did so. The mere fact that the issue could have been argued differently, or with a different emphasis or focus, does not establish ineffective assistance. (See *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.)

## H. *Prosecutorial Misconduct*

■■■■ Defendant contends that the prosecutor engaged in misconduct by vouching for the credibility of Sandra B., and by arguing his personal belief that defendant should receive the death penalty.

In his closing argument, the prosecutor told the jury that Sandra B. had very little to lose by testifying "because as you know she made taped statements to the police also the night [the killing] occurred, which are virtually identical to her testimony." When the defense objected, the prosecutor said: "Let me put it this way. There's no evidence that anything she told police is contrary to what she told you." The court then sustained a defense objection. Defendant, however, did not ask the court for an admonition to the jury to lessen any possible prejudicial effect. Defendant is thus precluded from now raising the issue. (*People* v. *Miller* (1990) 50 Cal.3d 954, 1001 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Ghent, supra,* 43 Cal.3d at p. 762; *People* v. *Green, supra,* 27 Cal.3d at p. 34.)

Later, the prosecutor asked the jury "to bring back a verdict of death because I think it's warranted and appropriate in this case." Because defendant did not object and did not request the trial court to admonish the jury, he may not now raise the issue. (*People* v. *Miller, supra,* 50 Cal.3d at p. 1001; *People* v. *Ghent, supra,* 43 Cal.3d at p. 762; *People* v. *Green, supra,* 27 Cal.3d at p. 34.)

■■■■ In any event, the prosecutor's remarks were not prejudicial in this case. It may be recalled that, in the middle of Sandra B.'s testimony at the

penalty phase, the defense called the prosecutor as a witness. The prosecutor testified that he had personally recommended to the district attorney to seek the death penalty against defendant, but not against Sandra because of her taped statements to the police. In his closing argument, the prosecutor pointed out that Sandra's taped statements to the police were "along the lines of her testimony today." In asking the jury to impose the death penalty, the prosecutor did not disclose any new information to the jury. Although the taped statements of Sandra were not themselves in evidence, the jury knew of their existence and had a general idea of their content. Under these circumstances, it is not reasonably possible that the prosecutor's comments prejudicially affected the jury's penalty decision. (*People* v. *Burton* (1989) 48 Cal.3d 843, 864 [258 Cal.Rptr. 184, 771 P.2d 1270].)

### I. *Instructional Error—Defendant's Character and Background*

The trial court instructed the jury that in determining penalty it was to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) Defendant contends that because this instruction did not also state that the jury could consider any aspect of defendant's character or background, the jury was not able to consider all of the mitigating evidence. We disagree.

A reasonable jury, unless it has been misled, should understand this instruction as including consideration of mitigating character and background evidence. (*Boyde* v. *California, supra,* 494 U.S. 370, 380-383 [108 L.Ed.2d 316, 329-331, 110 S.Ct. 1190, 1198-1199]; *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1225.) Our task is to examine the record to ascertain whether there was a reasonable likelihood that the jury was misled and applied the instruction in a way that prevented jury consideration of the mitigating evidence. (*People* v. *Hayes, supra,* 52 Cal.3d at p. 640; *People* v. *Allison* (1989) 48 Cal.3d 879, 899-901 [258 Cal.Rptr. 208, 771 P.2d 1294]; compare *Penry* v. *Lynaugh* (1989) 492 U.S. 302 [106 L.Ed.2d 256, 109 S.Ct. 2934] [instructions not allowing consideration of mitigating evidence].)

The jury in this case was instructed that in deciding penalty it could consider pity, sympathy, or mercy for the defendant. Also, defense counsel argued this instruction to the jury. In addition, defense counsel asked the jury to consider in mitigation defendant's childhood experiences, his father's dislike of him, his "wretched" life, and his prior kindness to the two children. The prosecutor never suggested in closing argument that the jury could not consider such evidence. There is no reasonable likelihood that in this case the trial court's failure to add to the instruction that the jury could

also consider any aspect of defendant's character or background, impaired the jury's consideration of relevant mitigating evidence. (*People* v. *Hayes*, *supra*, 52 Cal.3d at pp. 640-641.)

## J. *Triple Counting of Aggravating Factors*

Defendant contends that the trial court's instruction describing how the jury was to make its penalty determinations, coupled with assertedly misleading argument by the prosecutor, allowed the jury to improperly triple count defendant's conduct, thereby artificially inflating the aggravating circumstances and eliminating a mitigating circumstance.

The trial court gave this instruction (CALJIC No. 8.84.1 (4th ed. 1979)): "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, (except as you may hereafter be instructed). You shall consider, take into account and be guided by the following factors, if applicable: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance(s) found to be true. [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence, or the expressed or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction. . . ."

During closing argument, the prosecutor noted that the instruction at issue was unclear as to how the jury should address the crimes of child endangerment of which defendant was convicted in this case based on the incidents that occurred in June 1981 and April 1983, before the events in this case that resulted in James's death.[17]

Defendant contends, correctly so, that factors (b) and (c) of CALJIC No. 8.84.1, which track the language of factors (b) and (c) of

---

[17]The prosecutor discussed the various factors that, in his view, the jury should consider in its penalty determination. He then explained why he had left out certain factors: "Basically either a factor was irrelevant or irrelevant to your consideration in my opinion or one that didn't point one way or the other as to what would be the appropriate sentence. [¶] I left out—the first one I left out was (b), which is the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violent. [¶] Well, there was really no evidence of that in this case. There was a lot of talk around it, but—and I don't know exactly how to handle the prior crimes which you dealt with and which you handed down verdicts on in this case also. The instruction is not clear whether you're to treat those as prior convictions or prior criminal acts or whether they're part of this case. [¶] I'm not going to suggest to you which you should do. I frankly don't know. You'll have to decide for yourselves. It's for that reason that I left that one out, because we know there was criminal activity that proceeded the murder, but because it was dealt with in this case, I'm not exactly sure how I should tell you how to deal with that so I left that factor out. You may disagree with me and decide to view two cases in some way that will affect your verdict. [¶] (c), no prior felony conviction. That sort of falls into the same category. Before this trial, Mr. Mincey certainly had not been convicted of anything. We know

section 190.3, apply only to criminal activity other than the crimes for which he was convicted in the present proceeding. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106.) Defendant was convicted of five counts of endangering a child, in addition to being convicted of murder. Defendant maintains that the instruction at issue and the prosecutor's argument allowed the jury to consider defendant's child abuse convictions three times, that is, under factors (a), (b), and (c) of the instruction.

Instructing the jury under CALJIC No. 8.84.1 is not error in the absence of misleading argument by the prosecutor. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 106; *People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148].) Here, while commenting that he was not sure how the offenses should be categorized, the prosecutor merely asked that the jury consider the offenses, not that it consider them two or three times. The prosecutor's argument did not mislead the jury. Thus, the trial court did not err in giving CALJIC No. 8.84.1 (4th ed.) in this case. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 226-227 [260 Cal.Rptr. 583, 776 P.2d 285].)

## K. *Age as an Aggravating Factor*

■ The trial court instructed the jury that it could consider defendant's age in its penalty determination. Defendant argues this was error because age is a mitigating rather than aggravating factor. We have in the past rejected this argument. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 280 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Defendant has given us no persuasive reason to reconsider these decisions.

Also, the record does not support defendant's assertion that the prosecutor improperly argued that defendant's chronological age in itself was an aggravating factor. The prosecutor, after saying that defendant's chronological age was a factor against him, noted there was testimony that defendant had the intellectual or mental age of a teenager. The prosecutor then added, "I don't think that particular factor [age] cuts one way or the other in this case."

## L. *Effect of Guilt Phase Errors*

■ Defendant contends the judgment of death must be reversed because of errors that occurred at the guilt phase of his trial. He urges that, in

---

that. How do we treat the prior two cases is up to you. I'm not sure. He now stands convicted of two previous child abuse cases. [¶] In that connection, I think it's important for you to consider those prior cases, at least from the standpoint of the arrests and how they were handled, because Mr. Mincey as we talked about with the psychiatrists, had been warned. . . ."

evaluating the propriety of the jury's penalty decision, we use the "substantial error" test. Application of this standard of error at the guilt phase, defendant asserts, requires reversal of the judgment of death.

The test of error urged by defendant is a rule of penalty phase error that was applied to pre-1972 death penalty statutes, which vested the jury with absolute penalty discretion, thus rendering any "substantial" penalty phase error prejudicial and reversible. (*People* v. *Lucky, supra,* 45 Cal.3d at p. 294, fn. 23.) This strict standard no longer applies, because the 1977 and 1978 death penalty statutes include constitutionally sufficient standards to guide jury discretion. (*Ibid.*) In this case, defendant was tried under the 1978 law.

There was one error of significance that occurred at the guilt phase of the trial. The error pertained to defendant's convictions for misdemeanor child endangerment (counts 5 and 6). As explained earlier, those two offenses were barred by the applicable one-year statute of limitations, thus requiring that the convictions therefor be set aside. We conclude that it is not reasonably possible that the jury would have rendered a different penalty phase verdict had this error not occurred at the guilt phase. (*People* v. *Burton, supra,* 48 Cal.3d at p. 864; *People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

M. *Cumulative Impact of Penalty Phase Errors*

Defendant contends that the cumulative impact of errors at the penalty phase of the trial compels reversal. Based on our review of the entire record, we disagree. Whether considered singularly or collectively, the penalty phase errors were harmless.

N. *Other Constitutional Challenges*

Defendant asserts that his death judgment violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because (1) the trial court failed to delete inapplicable mitigating factors, instructed the jury that extreme mental disturbance could be a mitigating factor, instructed the jury that moral justification would be a mitigating factor only if believed by defendant, and admitted allegedly inflammatory photographs; (2) imposition of the death penalty is arbitrary, discriminatory, and disproportionate; and (3) the 1978 sentencing statute is unconstitutional. We have in previous cases rejected each of these contentions. (See, e.g., *People* v. *Bonin* (1988) 46 Cal.3d 659, 709 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 612-613 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 104; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777.)

## O. *Proportionality Review*

Defendant contends that his sentence is unconstitutionally disproportionate both in comparison to those convicted of similar offenses and in relation to his own culpability.

■ "Intercase" proportionality review is not required by the federal Constitution (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]), and we have consistently declined to undertake it (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 151 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Hayes, supra,* 52 Cal.3d at p. 645; *People* v. *Kaurish* (1990) 52 Cal.3d 648, 716 [276 Cal.Rptr. 788, 802 P.2d 2788].)

But the imposition of a death sentence is subject to "intracase" review to determine whether the penalty is disproportionate to a defendant's personal culpability. (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 15; *People* v. *Andrews, supra,* 49 Cal.3d 200, 234.) A sentence that is grossly disproportionate to the offense for which it is imposed may violate the prohibition against cruel or unusual punishment contained in article I, section 17 of the California Constitution. (*People* v. *Kaurish, supra,* 52 Cal.3d at p. 716; *People* v. *Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697].) ■ Defendant asserts that his sentence is disproportionate because child discipline homicides fall into a special class of murders, because Sandra B. was convicted of involuntary manslaughter and sentenced to six years in prison, because there is uncertainty as to his actual role in the death of James, and because of his below-average intelligence. Our review of the facts leads us to conclude that the death penalty is not disproportionate to defendant's individual culpability.

Defendant was convicted of having tortured to death a five-year-old child. We have previously rejected the argument that death is a disproportionate penalty for a parent who "disciplines his [or her] child to death." (*People* v. *Wade, supra,* 44 Cal.3d at p. 1000.) The disparity in sentencing imposed on defendant and Sandra B. does not establish that defendant's sentence is grossly disproportionate to the offense he committed. Evidence of the disposition of a codefendant's case, as opposed to evidence of the codefendant's complicity and involvement in the offense, is not relevant to the decision at the penalty phase, which is based on the character and record of the *individual* defendant and the circumstances of the offense. (*People* v. *Belmontes, supra,* 45 Cal.3d at p. 811.) Here, the jury determined on substantial evidence that defendant was the actual killer and that he intended to kill. The evidence of defendant's below-average intelligence is insufficient to make the sentence disproportionate to his individual culpability. (See *Penry* v.

*Lynaugh, supra,* 492 U.S. at p. 333 [106 L.Ed.2d at pp. 287-288]; *People* v. *Poggi* (1988) 45 Cal.3d 306, 348 [246 Cal.Rptr. 886, 753 P.2d 1082].) As may be recalled, defendant had beaten and tortured five-year-old James over an extended period of time.

P. *Motion for Modification of Penalty*

■ Defendant contends that the trial court erred in ruling on his application for modification of the death sentence by failing to independently review the evidence to determine whether the jury's findings and verdict were contrary to the law and evidence, and by failing to state the reasons for its ruling.

The trial court's pertinent comments were as follows: "Let me indicate I have considered the arguments offered by the defense. *I have independently considered any reasons that I could think of for lessening the sentence.* It must be remembered that the imposition of the death penalty or the penalty of death is a penalty which has been prescribed by the people of the State of California. Judges, no more than lawyers, judges and lawyers do not have the luxury, as do those of you who purport to know everything and are fast to criticize us in our occupations, we don't have the luxury of deciding whether it is in the best interests of society or not in the best interest. We follow the law as we understand it to have been given to us by the people and by the Legislature. [¶] I find no elements of mitigation in this matter. It is therefore the judgment of this court that the recommendation of the jury should be followed." (Italics added.)

Under section 190.4, subdivision (e), a capital defendant is deemed to have automatically applied for a sentence modification. In ruling on the application, the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) The judge must also state on the record the reasons for the ruling. (*People* v. *Kaurish, supra,* 52 Cal.3d at p. 716.)

Here the record shows that the trial judge did independently review the evidence and did determine that the jury's decision was appropriate. The judge stated that he had independently considered reasons for lessening the sentence, found no elements of mitigation, and determined that the recommendation of the jury should be followed. Although a more specific recitation of the trial court's determination would have been desirable, the record sufficiently shows that the court did undertake an independent review. We

therefore reject defendant's contention that the trial court failed to independently review the evidence.

We agree with defendant's assertion, however, that the trial judge failed to state on the record the reasons for his findings. (§ 190.4, subd. (e).) Ordinarily, out of an abundance of caution, we would remand for a new hearing on the verdict modification application because of the trial judge's familiarity with the record. But in this case the trial judge is no longer alive. Thus, we must determine whether the judge's failure to state reasons for his decision that the jury's findings and verdict were not contrary to the law and evidence so prejudiced defendant as to necessitate a reversal of the penalty decision. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 200 [246 Cal.Rptr. 673, 753 P.2d 629].)

Even if we assume that the strict "harmless beyond a reasonable doubt" standard of review of *Chapman* v. *California* (1966) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] is applicable here, the trial judge's failure to specifically state the reasons for denying the application for modification was not prejudicial because the evidence in aggravation far outweighed the evidence in mitigation. It is clear beyond a reasonable doubt that a statement of reasons would not have altered the trial judge's conclusion or revealed reversible error. (*People* v. *Heishman, supra*, 45 Cal.3d at p. 201.)

Defendant brutalized James, a helpless five-year-old child, over an extended period of time. Defendant beat James with a variety of objects, slammed him against the shower and bedroom walls, forced him to eat feces, and shoved a board against his buttocks with a force so great as to cause serious injuries. The inside of James's anus was torn by a fingernail or similar object, and he was struck hundreds of times all over his body, including the genitals.

Compared to the aggravating circumstances just discussed, the mitigating evidence was weak, relating primarily to defendant's character and background. The duration of the beatings that culminated in James's death and the manner in which the beatings were administered undermine the defense position that the killing was the result of an explosive, intermittent personality disorder. Although there was testimony that defendant's intelligence was lower than average, there was no evidence that defendant was unable to fully understand and control his actions, or to appreciate the suffering he was inflicting at the times relevant here.

Q. *Parker* v. *Dugger*

In January 1991, the United States Supreme Court decided *Parker* v. *Dugger* (1991) 498 U.S. 308 [112 L.Ed.2d 812, 111 S.Ct. 731]. Defendant contends that *Parker* compels the conclusion that the sentence given a codefendant must be admitted at the penalty phase and that our decisions to the contrary must be overruled. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 225 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 343 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Belmontes*, *supra*, 45 Cal.3d at pp. 810-813.) Defendant also argues that *Parker* compels acceptance of his arguments relating to Sandra B.'s assertion of the attorney-client privilege during cross-examination and the trial court's exclusion of evidence pertaining to Sandra's prior abuse of the children. Additionally, defendant asserts that *Parker* requires intercase proportionality review. *Parker* does not support any of defendant's contentions.

In *Parker* v. *Dugger*, *supra*, 498 U.S. 308, a Florida jury convicted the defendant of two counts of first degree murder. At an advisory sentencing hearing, the defendant introduced, among other things, evidence that none of his accomplices had received the death penalty. The jury recommended that the defendant be sentenced to life imprisonment. But the trial judge, who under Florida law ultimately decides the sentence, overrode the jury's recommendation as to one of the murders and sentenced the defendant to death. The judge found six of the statutory aggravating circumstances present, but no statutory mitigating circumstances. The judge made no comment about *nonstatutory* mitigating evidence. The order, however, stated " '[t]here are no mitigating circumstances that outweigh the aggravating circumstances.' " (*Id.* at p. __ [112 L.Ed.2d at p. 820, 111 S.Ct. at p. 734].) The Florida Supreme Court held that the evidence was insufficient to support two of the aggravating circumstances, but nevertheless affirmed the judgment based on the erroneous conclusion that the trial court had found no mitigating circumstances.

The United States Supreme Court reversed and remanded the case. The high court concluded that the trial judge did consider *nonstatutory* mitigating evidence. (*Parker* v. *Dugger*, *supra*, 498 U.S. at p. __ [112 L.Ed.2d at p. 824, 111 S.Ct. at p. 738].) It held that because the Florida Supreme Court had (1) mischaracterized the trial judge's decision as finding no mitigating circumstances (as opposed to finding that the aggravating circumstances outweighed the mitigating circumstances) and (2) struck two of the trial court's aggravating circumstance findings, the Florida Supreme Court was required on review either to reweigh the evidence or to conduct a harmless error analysis. (*Id.* at pp. __ [112 L.Ed.2d at pp. 824-825, 111 S.Ct. at pp. 738-739.) The United States Supreme Court remanded the case with direc-

tions to the state to initiate appropriate proceedings to reconsider the defendant's death sentence in light of the record, the sentencing hearing, and the trial judge's findings. (*Id.* at p. ___ [112 L.Ed.2d at p. 827, 111 S.Ct. at p. 740.)

■ Contrary to defendant's claim in this case, the high court in *Parker* v. *Dugger, supra,* 498 U.S. 308, did not hold that evidence of a codefendant's sentence must be introduced at trial as mitigating evidence or that a comparison between sentences given codefendants is required. In Florida, unlike California, a codefendant's sentence disposition is admissible. We specifically noted and rejected the Florida rule in *People* v. *Belmontes, supra,* 45 Cal.3d at pages 811-813. Nothing in *Parker* supports the conclusion that California is constitutionally required to adopt the Florida rule. Nor does *Parker* compel us to accept defendant's arguments concerning Sandra B.'s assertion of the attorney-client privilege or the exclusion of evidence of her prior abuse of the children.

■ Also not supported by a fair reading of the case is defendant's assertion that under *Parker* v. *Dugger, supra,* 498 U.S. 308, we must conclude that the trial court here erred in stating that it found no elements of mitigation in ruling on the automatic motion for modification of penalty. As discussed above, the high court's reversal in *Parker* was based on the Florida Supreme Court's failure to reweigh the evidence or to conduct a harmless error analysis. (*Id.* at p. ___ [112 L.Ed.2d at p. 824, 111 S.Ct. at p. 738.) In this case, we have, in connection with the automatic motion for modification, conducted a harmless error analysis.

## VII. CONCLUSION

The misdemeanor convictions for endangering a child (counts 5 and 6) are reversed. In all other respects, the judgment is affirmed.

Lucas, C. J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. After review, I have found no error requiring reversal or vacation on either issue.

I dissent from the judgment, however, as to the sentence of death. As I shall explain, there was prejudicial juror misconduct bearing on that question.

The facts are these. In his summation at the penalty phase, defense counsel urged the jury to spare defendant's life. "I . . . have a personal

belief," argued counsel, "that the laws of God are very absolute, that the Sixth Commandment which says 'Thou shalt not kill' is a very absolute rule. It reflects the values of western culture that tell us that human life is very sacred, and I don't know of any exemption granted to the State of California by the Sixth [Commandment] permitting the state to kill. The . . . laws of God I believe are absolute . . . ." (Internal quotation marks added.)

Soon, the jury commenced deliberations. After excusing the panel for the day, the trial judge, on the bailiff's mention, noticed that one of the jurors, Glenda Hoffman, was holding a book under her arm. He asked what it was, and she revealed it to be a Bible. He then asked whether she had had it in the jury room, and she said yes. On voir dire during jury selection, Hoffman had identified herself as a Baptist, and stated that she was affiliated with an organization called "Campus Crusade"—which was "not really a church," "more than just employment," "[i]t's kind of a way of life." Also on voir dire, at least seven of the other eleven jurors had identified themselves as Christians.

The next day, before the jury recommenced deliberations, the trial judge conducted an inquiry into the incident.

Summoning Juror Hoffman into chambers outside the presence of the other members of the panel, the trial judge questioned, "When . . . did you take the Bible into the jury room?" She replied, "During—after lunch . . . ." He questioned, "And what use did you make of the Bible?" She replied, "We were all finished and we were all getting ready to go home and some people kept making references to the Bible, and I said, well, I have it right here. And I go, do you all want to—whoever wants to go can go, whoever wants to stay can stay. So everybody stayed and so we read a few verses from it."

On further questioning by the trial judge, Juror Hoffman stated that she had read for her colleagues Numbers 35:16: "But if he struck him down with an iron object, so that he died, he is a murderer; the murderer shall be put to death."

She stated that she had also read Numbers 35:21: "Or if he struck him down with his hand in enmity and as a result he died, the one who struck him down shall surely be put to death."

In addition to the foregoing, she stated that she had read Romans 13:1-5, as follows.

"Let every person be in subjection to the governing authorities. For there is not authority except from God, and those which exist are established by God.

"Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnation upon themselves.

"For rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good, and you will have praise from the same.

"For it is a minister to God to you for good. But if you do what is evil, be afraid; for it does not bear the sword for nothing; for it is a minister of God, an avenger who brings wrath upon the one who practices evil.

"Wherefore it is necessary to be in subjection, not only because of wrath, but also for conscience' sake."

Juror Hoffman added: ". . . [P]eople know clearly how I feel, and so reading the Numbers verse they knew definitely how I felt about reading it, so it was like they knew it was a hard thing for me to read it, but I just felt like I needed to clear up, that the Bible is not—there's different views that come from the Bible that people get, so that was—that was my point."

Summoning each of the other jurors into chambers outside the presence of the rest, the trial judge questioned whether the facts were as Juror Hoffman had represented. He received answers that were substantially affirmative. He also questioned whether Hoffman's reading of the Bible verses had had any influence. He received answers that were substantially negative. He did not question Hoffman herself about this matter, and hence received no answer.

Following his inquiry, the trial judge found that "what transpired in the jury room was that Ms. Hoffman read Romans 13 verses 1 through 5, Numbers 35 verses 16 and 21." He also found that "it occurred, . . . it happened at the conclusion or after they had completed their deliberations for the day . . . ." Lastly, he found that Hoffman's "fellow jurors' approach to their deliberations has not been affected by that reading. It may be deemed to disclose to us Ms. Hoffman's approach, but beyond that—and that is not anything which would justify discharging the jury. There is no motion for mistrial. I find no harm, no denial of any protection has occurred."

In open court, the trial judge stated to the jury: "The jurors had at the conclusion of their deliberations access to a Bible yesterday. I admonish you again, do not take anything into the jury room with you. No reference books of any kind, no verses, no poems, no newspapers, no anything. You are required by the law of the State of California to decide this case on the basis of the evidence adduced here in court and the law of the State of California.

What you have that you bring with you from your background, your heritage, your training, of course, you bring to bear. But do not take any other types of reference materials with you."

After further deliberations, the jury returned a verdict of death.

It is, of course, misconduct for a juror to introduce any extrinsic material into the jury room. (See Pen. Code, § 1137.) "Jurors are not allowed to obtain information from outside sources either as to factual matters or for guidance on the law." (*People* v. *Karis* (1988) 46 Cal.3d 612, 642 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Consequently, it is misconduct for a juror to introduce extraneous law. (E.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676]; *In re Stankewitz* (1985) 40 Cal.3d 391, 399 [220 Cal.Rptr. 382, 708 P.2d 1260].) "The courts have condemned the use of a common dictionary by jurors where there exists a reasonable possibility that it was used to define legal terms, or act as a substitute for instructions in the jury's deliberations. . . . [¶] The outcome has been similar when the material at issue was a legal or quasi-legal text," including even such items as "a Readers' [*sic*] Digest guide entitled 'You and the Law' . . . ." (*Jones* v. *Kemp* (N.D.Ga. 1989) 706 F.Supp. 1534, 1558 [discussing the general common law].)

On the very face of the record of the trial below, juror misconduct is manifest. The majority recognize the fact, as they must.

Juror Hoffman introduced extrinsic material into the jury room, viz., the Bible. That is undisputed. The impropriety cannot be dismissed as the product of inadvertence. Not long before the incident, the trial judge had made plain to the jurors that extrinsic material did not belong in the jury room when he denied a request for a legal dictionary as "inappropriate." Neither can the impropriety be justified or even excused as a "response" to defense counsel's comments during summation. Hoffman was free to disagree with the remarks—but that is all.

Further, the extrinsic material Juror Hoffman introduced constituted extraneous law. That is indisputable. The Bible is an "extra-judicial code of conduct—a code which mandates death for numerous offenses, including filial disobedience and breaking the Sabbath . . . . To the average juror, Webster's Dictionary may be no more than a reference book, and The Reader's Digest nothing more than a diverting periodical; but the Bible is an authoritative religious document and is different not just in degree, although

this difference is pronounced, but in kind." (*Jones* v. *Kemp*, *supra*, 706 F.Supp. at p. 1559.)

The *fact* of Juror Hoffman's misconduct is plain on the face of the record. She took the Bible into the jury room.

The *substance* of Juror Hoffman's misconduct is disclosed on only minimal scrutiny.

Hoffman read the verses set out above in an evident attempt to prove that defense counsel was "misstating" God's "law."

Counsel stated, "I . . . have a personal belief that the laws of God are very absolute, that the Sixth Commandment which says 'Thou shalt not kill' is a very absolute rule." (Internal quotation marks added.)

Against this remark, Hoffman quoted the cited passages from Numbers to establish the "rule" that death must be visited on the murderer who kills his victim "with his hand"—defendant beat James with his hand—or "with an iron object"—he also used a leather belt with metal grommets.

Additionally, counsel stated, ". . . I don't know of any exemption granted to the State of California by the Sixth [Commandment] permitting the state to kill."

Against this remark, Hoffman quoted the cited passage from Romans to give religious "legitimacy" to the secular state's use of capital punishment: governmental authority "is a minister of God, an avenger who brings wrath upon the one who practices evil."

Moreover, Hoffman read the verses set out above in an evident attempt to urge the death penalty as the religiously appropriate punishment for defendant's crime. That fact is express in the very words she quoted from Numbers—"the murderer *shall* be put to death" (italics added), he "*shall* surely be put to death" (italics added). It is implied in her comment, "[P]eople . . . knew it was a hard thing for me to read it . . . ."

The juror misconduct here did not offend California law alone. It also violated defendant's rights under the United States Constitution.

"It is well settled that religion may not play a role in the sentencing process." (*Jones* v. *Kemp, supra,* 706 F.Supp. at p. 1559.) The jury has "a duty to apply the law of the [jurisdiction] as given by the trial judge, not its own interpretation of the law or its own interpretation of precepts of the Bible, in determining whether the [defendant] should live or die." (*Ibid.*)

". . . A search for the command of extrajudicial 'law' from any source other than the trial judge, no matter how well intentioned, is not permitted. The use by deliberating jurors of an extrajudicial code . . . cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channelled and circumscribed by the secular law of the jurisdiction." (*Jones* v. *Kemp, supra,* 706 F.Supp. at p. 1559.)

Further, "[a] situation in which a jury, unsupervised by the court and unobserved by counsel, could reach a conclusion by consulting sources other than the legal charge of the court and evidence actually received by the court is not permitted. 'The Sixth Amendment guarantees that the accused shall enjoy the right to a trial by an impartial jury and shall be confronted with the witnesses and evidence against him. . . . The most general interpretation of a fair trial is that it be conducted before unprejudiced jurors under the superintendence of a judge who instructs them as to the law and advises them as to the facts. Judicial control of the juror's knowledge of the case pursuant to the laws of evidence is fundamental to the prevention of bias and prejudice.' Extraneous materials, whether they be dictionaries, law books, or Bibles, unless properly received in evidence, are not allowed in the jury room for use by a deliberating jury. The jury should have with it in the jury room *only* those documents received in evidence, or perhaps judicially noticed and a copy of the court's charge if reduced to writing—nothing else." (*Jones* v. *Kemp, supra,* 706 F.Supp. at p. 1560, italics in original, citation omitted.)

Juror misconduct raises a presumption of prejudice. (E.g., *People* v. *Marshall, supra,* 50 Cal.3d at p. 949; *In re Stankewitz, supra,* 40 Cal.3d at p. 402.) The presumption is heavy indeed when the impropriety "goes to a key issue in the case . . . ." (*In re Stankewitz, supra,* at p. 402.) It is heavier still when the death penalty is involved. (*Ibid.*) "[T]he state must then rebut the presumption"—if it can—"or lose the verdict." (*People* v. *Marshall, supra,* at p. 949.)

Whether or not the presumption of prejudice raised by juror misconduct is rebutted is resolved as follows.

"A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' . . .

" 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.'

"Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial." (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 950-951, citations omitted.)

The question is: Have the People rebutted the presumption of prejudice raised by Juror Hoffman's misconduct? That is to say, have they established that there is no substantial likelihood that any juror was improperly influenced to defendant's detriment?

The presumption is exceedingly heavy here: the misconduct went to the first, last, and only issue before the jurors in the penalty phase of this capital trial, viz., whether defendant's life would be taken or spared.

The answer is: No, the People have failed in their attempt—they have not established the absence of a substantial likelihood of improper influence. By its very facts, defendant's murder of James raised the crucial question

whether *lex talionis* was applicable and, if so, what result its application would yield. The words read by Juror Hoffman provided a clear and simple answer: the principle of retribution operated—and demanded death. That answer must be deemed forceful indeed, coming as it did from what many consider an authoritative source—if not Authority Itself. My conclusion might well be different for a nonreligious society peopled with nonbelievers. But the trial below was not conducted in such a society, and the jurors who sat in judgment were not such men and women.

I recognize that the trial judge effectively found that none of the other 11 jurors was improperly influenced by Juror Hoffman's misconduct. But he did not—and indeed, could not—make such a finding as to Hoffman herself. It is settled that a verdict cannot stand if even a single juror has been affected. (*In re Stankewitz, supra*, 40 Cal.3d at p. 403.)

I also recognize that the trial judge delivered an admonition to the jury. His words could not have cured or prevented any harm arising from Juror Hoffman's misconduct because they carefully, but clearly, avoided the question. True, the judge told the jurors that "You are required by the law of the State of California to decide this case on the basis of the evidence adduced here in court and the law of the State of California." But he did *not* tell them that they were required *not* to consider the Bible verses in question. Rather, he implied that they could do so. He said: "What you have that you bring with you from your background, your heritage, your training, of course, you bring to bear." As noted, at least eight of the jurors, including Hoffman, had identified themselves as Christians. That being so, they presumably "brought" the verses with them from their "background," "heritage," and "training."

Finally, I recognize that the jury did not return its verdict of death immediately after Juror Hoffman's misconduct. That fact means only that Hoffman's impropriety did not instantly determine the outcome. It simply does not suggest that it was without improper influence.

The majority conclude that the People have rebutted the presumption of prejudice raised by Juror Hoffman's misconduct. Their reasoning is that the trial judge's admonition negated any substantial likelihood of improper

influence. But as shown above, the judge's words could not have cured or prevented the threatened harm: they did not bar—but indeed, impliedly allowed—consideration of the Bible verses in question.[1]

For the foregoing reasons, I would reverse the judgment of death.

Appellant's petition for a rehearing was denied May 27, 1992, and the opinion was modified to read as printed above.

---

[1]Because of the result I reach, I need not consider whether the federal constitutional violations found above would require reversal in and of themselves. But if I were to address the question, I would give an affirmative response. It is, of course, the rule that error of federal constitutional dimension is not automatically reversible, but rather is subject to harmless-error analysis under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], viz., was the error harmless beyond a reasonable doubt? The rule covers all ordinary "trial error[s]." (*Arizona* v. *Fulminante* (1991) __ U.S. __, __ - __ [113 L.Ed.2d 302, 329-330, 111 S.Ct. 1246, 1263-1264].) Excepted therefrom are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Id.* at p. __ [113 L.Ed.2d at p. 331, 111 S.Ct. at p. 1265].) The violations here would require reversal. They appear to fall within the exception of automatic reversibility: they call the impartiality of the jury into serious question and thereby undermine the very integrity of the trial. But even if they come within the rule of harmless-error analysis, the result is the same: in view of the discussion set out above, they cannot be deemed harmless beyond a reasonable doubt.